MAX E. WILDMAN AND JOYCE L. WILDMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13665–80.     Filed June 10, 1982.

*Sheldon P. Migdal* and *Bruce C. Strohm*, for the petitioners. *Anita N. Gottlieb* and *James F. Kidd*, for the respondent.

---

FAY, *Judge*: Respondent determined a deficiency of $77,381.90 in petitioners' 1975 Federal income tax. The issues are whether petitioner Max E. Wildman as a limited partner is entitled to (1) a deduction for a distributive share of losses claimed by the partnership and (2) a claimed investment tax credit arising from the partnership's purchase and distribution of a movie.[1]

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

At the time they filed their petition, Max E. Wildman and Joyce L. Wildman resided at Lake Bluff, Ill.

Max E. Wildman (petitioner) is a lawyer who has been practicing in Chicago for about 35 years. In mid-November 1975, petitioner received a letter from a Chicago law firm (hereinafter the law firm) soliciting his investment in a limited partnership, the New London Co., to be formed for the purpose of acquiring the United States and Canadian distribution rights to a movie called "Sea Wolf." On November 24, 1975, petitioner signed a subscription agreement and purchased 50 units of New London Co. for $50,000.

New London Co. (hereafter New London or the partnership) was formed on December 3, 1975, pursuant to the New York State Limited Partnership Act. The partnership consisted of 2 general partners and 24 limited partners. The limited partners made cash contributions totaling $665,000. The partnership agreement provided 98 percent of the profits and losses were to be allocated pro rata among the limited partners, and the remaining 2 percent was to be allocated in equal shares to the

---

[1]Petitioners in the following cases have filed stipulations to be bound by the disposition of the captioned case insofar as it involves New London, the partnership: Frank L. Laport, docket No. 6963–79; Luis Iravedra and Emma A. Iravedra, docket No. 6423–80; Estate of Vincent P. Russo, Deceased, Frances G. Russo and Arthur H. Barbakoff, Executors, and Frances G. Russo, Petitioners, docket No. 6837–80; Frank L. Laport and Louise M. Laport, docket No. 7484–80; Sheldon I. Saitlin, docket No. 12726–80; Herbert M. Graham and Estelle P. Graham, docket No. 15802–80; David B. Dahl and Gisele Dahl, docket No. 15803–80; Albert Chams and Huguette Chams, docket No. 17364–80; Gary A. Rosenberg and Gloria J. Rosenberg, docket No. 1720–81; Sheldon I. Saitlin, docket No. 2278–81; Stuart Simon and Sally Simon, docket No. 2275–81; William Ross, docket No. 4459–81; Edward Morris Bakwin, docket No. 4993–81; Edward Morris Bakwin, docket No. 7375–81; Estate of Vincent P. Russo, Arthur H. Barbakoff and Frances G. Russo, Coexecutors, and Frances G. Russo, docket No. 7403–81; Bernard and Lois Burnstine, docket No. 10883–81; and Leslie F. Epstein and Linda Epstein, docket No. 1774–81.

general partners. The articles of limited partnership provided the partnership was to continue until December 31, 1991, unless sooner terminated by certain acts. A certificate of limited partnership for New London was executed and filed on January 12, 1976.

On December 8, 1975, a purchase agreement was entered into between Trans Continental Films Anstalt (TCA), a Liechtenstein corporation, and New London whereby New London acquired all of TCA's rights in a defined territory to the feature-length motion picture entitled "Sea Wolf."[2] New London acquired the right to distribute the movie in any form of media in the United States, its territories and possessions, and in English-speaking Canada. In exchange, New London agreed to pay $4 million payable as follows:

(a) $275,000 cash on or before December 20, 1975,
(b) $185,000 cash on or before February 1, 1976, and
(c) a $3,540,000 nonrecourse note.

The $3,540,000 nonrecourse note was due in 12 years, bore interest at 6 percent per annum, and was secured by the movie. The note was payable solely from proceeds actually received by New London from exploitation of the movie. The agreement provided:

(1) [New London] shall retain all net receipts[3] until [New London] has received a sum equal to all sums that would be payable to [New London] by the distributor from the first $1,540,000 of Net Film Rentals if the film were distributed directly by the distributor without the use of sub-distributors.

(2) thereafter, thirty (30%) per cent of net receipts shall be retained by [New London] and Seventy (70%) per cent paid to [TCA] in reduction of the Note until the Note is paid in full * * *

Thus, New London made cash downpayments of $460,000 to TCA, was entitled to retain its share of the first $1,540,000 of net film rentals, and, thereafter, was required to share its own net receipts with TCA (70 percent to TCA, 30 percent to New London) until TCA received $3,540,000.

The partnership turned over the function of distributing the

---

[2]TCA acquired its rights from the producer, Michael-Arthur Films Productions. The terms of that agreement were not disclosed.

[3]Generally, net receipts are the amount actually received by New London from any distributor, subdistributor, or licensee, less expenses of New London in connection with the delivery of the movie and administration of the distribution agreements.

film to a distributor who undertook to arrange exhibitions and to advertise and promote the movie in return for a percentage of the gross film rentals. Sometime before the execution of the purchase agreement with TCA, New London entered into such a distribution agreement with Allied Artists Picture Corp. (AA). AA acquired the exclusive right to distribute the movie in all forms of media for a period of 15 years. Generally, AA had complete control over all phases of marketing and distribution. AA agreed to use its best efforts to release "Sea Wolf" theatrically in the United States for not less than two play dates in 1975. AA was to pay New London 50 percent of theatrical gross film rentals. Generally, television and other nontheatrical gross film rentals were to be divided equally after AA was reimbursed for expenses of such distribution.[4]

The film, "Sea Wolf," is a technicolor feature-length film based on a novel written by Jack London, a world-renowned American novelist. "Sea Wolf," which had been made into a movie on several previous occasions, was produced in Germany in 1974 by Michael-Arthur Films Productions (Michael-Arthur). It was directed by Wolfgang Staudte and starred Edward Meeks and Raimund Haymstorf, none of whom have any significant American reputation. The screenplay was written by Walter Ulbrich. The movie had originally been made into a 6-hour film to be shown in a series of six 1-hour versions on German television. The movie was shortened to a 1½-hour version and dubbed in English for the North American market. Prior to December 1975, "Sea Wolf" had not been exhibited in the United States. A brief description of the movie follows:

> The year is 1903. It's the seafaring world of Jack London. A ship passes through the coastal waters off San Francisco. Suddenly there is a collision. Panic spreads through passengers and crew as they scramble for the lifeboats.
>
> Passenger Humphrey Van Wyden is not as fortunate as some, he can only find a floating piece of debris holding him from the murky depths of the sea as he clings to safety. Then a ship appears out of the mist. It is the Ghost, on its way to Japan to hunt seals.

---

[4]Generally, gross film rentals include all moneys received by AA as film rentals. If a license were to be given by AA to a subdistributor for a percentage of such subdistributor's gross film rentals, then AA's gross film rentals would be deemed to be the subdistributor's gross film rentals.

Wolf Larson captains the Ghost and although seemingly an educated man, he scorns normal human frailties and has no ethics. As captain he is the ultimate power aboard ship and sets himself up as judge and jury.

Van Wyden is a man with some intelligence, yet he feels intimidated by the futility of opposing Larson as he witnesses punishment dealt to members of the crew fighting for their rights as human beings. What transpires could only be written in the harsh memoirs of men at sea.

Van Wyden and Larson duel on their interpretations of morality and Van Wyden yields on his own principles out of fear for his own life. Larson realizes he has the edge because he is in control and the ultimate decision on who lives or dies is in his hands.

As the Ghost continues its journey, conflicts materialize between captain and crew to the point of rebellion. Larson is almost killed, yet returns to his task of running the ship, while relentlessly pursuing his rule by fear. His inhuman qualities are sure to lead to his downfall.

Van Wyden escapes, is rescued by a passing ship and as a result of his experiences aboard the Ghost has become enamored of the sea. He hires his own ship and charts a course for the mystical island of his childhood dreams. As he steps ashore and begins to explore the shores he is overcome by an innate fear. He discovers the Ghost and all the inhuman forces surrounding his previous experience begin to fill his mind. He finds Larson and feels the intimidation once overpowering his sense of right and wrong. Larson is near death and makes one last desperate attempt to succeed in corrupting his quarry but fails.

Whereas New London acquired the right to distribute "Sea Wolf" in most of North America, Twentieth Century Fox (hereinafter Fox), a widely known international corporation, acquired directly from the German producer, Michael-Arthur, the world-wide distribution rights of the same movie excepting the United States, Canada, Germany, Austria, Switzerland, France, Belgium, and the Iron Curtain countries. In exchange, Fox guaranteed a minimum payment of $390,000 for its world-wide rights excluding the Far East. For the Far East rights, Fox did not guarantee any minimum payment. Fox was also obligated to pay the producer 30 percent to 50 percent of film rentals. As of May 30, 1981, Fox had received gross receipts relating to the exhibition of "Sea Wolf" of $308,987.[5] Net receipts (gross receipts less taxes and expenses) were $282,268. Michael-Arthur's percentage share of those receipts amounted to $84,686. Thus, Fox had recouped almost $200,000 of its original cash purchase price.

---

[5] For example, the following gross receipts were generated: Italy—$94,123, Spain—$41,057, and Mexico—$32,881.

Ronald S. English (English) and Chuck Jones (Jones) were the two general partners of New London. Prior to 1975, English had no experience in the movie industry. His background was primarily in marketing securities, with some experience in real estate investments. In 1975, English became involved as a general partner in five limited partnerships, including New London, to purchase and distribute movies. None of those partnerships reported income in 1975, and all reported substantial losses.

English negotiated the purchase of "Sea Wolf" on behalf of New London. At the time negotiations were taking place, English understood the original 6-hour version had been cut to 1½ hours. He also knew Fox purchased the distribution rights to "Sea Wolf" in other territories. It was represented to English that over $1 million had been generated by "Sea Wolf" through German and French television revenues. It was also represented to English that actual production costs exceeded $4 million.

As English had little experience with movie investments, he searched for, and found in Jones, a partner with such experience. Jones had substantial experience in the entertainment and film industry encompassing such areas as marketing, promotion, and publicity. At the time of trial, Jones was the eastern advertising publicity director of APCO Embassy Pictures, a motion picture distributor. In return for fees and a 1-percent interest in the partnership, Jones offered his guidance. Jones arranged for three associates to view "Sea Wolf" and offer their evaluation.

Prior to 1975, Jones was not a general partner of any partnership engaged in purchasing and distributing movies. In 1975, Jones was a general partner with English in one other limited partnership which acquired the movie, "Rachel's Man," which was also released in December 1975, distributed by AA, and showed no profit. Jones was never involved in any negotiations or the solicitation of limited partners. English retained the law firm to assist in the acquisition of the film, the formation of the partnership, and the solicitation of investors.

In 1975, the partnership paid $37,000 in legal fees, $20,000 in "compensation" to the general partners ($18,000 to Ronald S. English and $2,000 to Chuck Jones), and $2,500 to Chuck

Jones for promotional services to be rendered over the life of the movie.

When petitioner Max E. Wildman agreed to enter the limited partnership, he understood the tax benefits involved and anticipated a tax writeoff in excess of his cash investment.

The film was shown at the Delft Theatre in Escanaba, Mich., on Sunday, Monday, and Tuesday, December 21, 22, and 23, 1975. Box office receipts were $144. Compensation payable by the Delft Theatre was 25 percent of box office gross receipts, or $36, which amount was in fact paid by the theater to Allied Artists, the distributor. No amounts due were paid to New London in 1975. "Sea Wolf" did not play at any other theater in the United States during 1975.

Lorimar Productions, Inc. (Lorimar), acquired substantially all the properties of AA, including the distribution rights to "Sea Wolf," after AA filed for bankruptcy in 1979. Lorimar produced a copy of a statement of estimated earnings of "Sea Wolf" prepared by AA. That statement showed total collections by AA as of December 31, 1980, for the movie were $10,620.95,[6] of which New London's share was 50 percent, or $5,310.48. On January 24, 1980, New London submitted an unsecured claim for $3,150.81 in the bankruptcy proceedings of AA.

On its 1975 Federal partnership return, New London reported a depreciation deduction of $1,001,739 with respect to its interest in the movie. The partnership also deducted $20,000 paid to the general partners, $2,500 in a promotional fee paid to Jones, and $33,000 in legal fees. The remaining $4,000 in legal fees was capitalized by the partnership. Petitioners, on their individual 1975 Federal income tax return, claimed a distributive share of the above-reported partnership deductions. The partnership also reported the movie as new investment property, with a cost basis of $4 million, which qualified for the investment credit. On their 1975 return, petitioners took a $29,240 investment credit based on a $292,400 share of the movie's cost basis as reported by the partnership. In his notice of deficiency, respondent

---

[6] Of $10,620.95 in total collections, $10,050.66 is stated as derived from U.S. television revenues.

disallowed all the above-claimed deductions and the claimed credit.

## OPINION

### *Depreciation*

Using the income forecast method and claiming a $4 million cost basis in the movie, New London claimed a depreciation deduction of $1,001,739 in 1975 for its interest in "Sea Wolf." Petitioners claimed a $77,102 proportionate share of such deduction in their 1975 individual Federal income tax. The issue is the extent, if any, to which the partnership is allowed such deduction. Respondent contends that no depreciation deduction is allowable, or, if a depreciation deduction is allowable, it is limited since (1) the transaction was not entered into with a profit motive, (2) under the income forecast method employed by the partnership, no deduction is allowable in any event, and (3) the partnership is not allowed to include the $3,540,000 nonrecourse note in its cost basis of the movie for purposes of computing depreciation. Since we agree with respondent's second contention, we need not address his alternative contentions.

Section 167(a)[7] provides a taxpayer shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion of property used in the trade or business or held for the production of income. With respect to motion picture films, respondent has authorized the income forecast method to compute depreciation. Rev. Rul. 60–358, 1960–2 C.B. 68; Rev. Rul. 64–273, 1964–2 C.B. 62. This method was authorized since, unlike most other depreciable assets, the useful life of a motion picture is difficult to measure. Under this method, the depreciation deduction is computed by multiplying the depreciable basis of the film by a fraction, the numerator of which is the net income[8] derived from the film in the taxable year, and the denominator of which is the estimated total income to be derived from the film during its useful life.

---

[7]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

[8]Net income for purposes of this computation is income derived from the film less expenses of distribution.

There is no dispute the income forecast method is a proper method of computing depreciation of the film. The dispute centers on how the numerator of the fraction used in that method is to be computed. The numerator is the "income from the film[s] for the taxable year." See Rev. Rul. 60–358, 1960–2 C.B. 68. Respondent contends the partnership must compute "income" for this purpose consistent with its general method of computing income. See sec. 461. Since the partnership is a cash basis taxpayer and actually received no income in 1975, respondent concludes the numerator of the fraction is zero and, thus, no depreciation is allowable. Petitioners contend that, in computing income for purposes of depreciating the movie under the income forecast method, the partnership is not limited to its general method of computing income. Petitioners claim the numerator may be measured by the partnership's "anticipated" net receipts.[9] We agree with respondent.

Dispositive of this issue is the recent case of *Siegel v. Commissioner*, 78 T.C. 659 (1982). There, we held that since the purpose of the income forecast method is to match depreciation deductions with the income derived from the film, the "income" reflected in the numerator of the fraction must reflect gross income derived from the film which is properly reportable by the taxpayer under its method of accounting.[10] It is undisputed that the partnership, a cash basis taxpayer, received no payments in 1975 for the exploitation of "Sea Wolf." Accordingly, any distribution proceeds due the partnership but not yet received in 1975 are not includable in the numerator of the fraction for that year. Thus, the partnership is allowed no depreciation deduction in 1975, and petitioners' distributive share of such deduction is zero.

Moreover, the partnership is not entitled to include the $3,540,000 note in its cost basis for purposes of computing

---

[9]The partnership's calculation was based on the assumption its anticipated net receipts for 1975 would bear the same relationship to its total anticipated net receipts as the 1975 gross box office receipts ($144) bears to the total anticipated gross box office receipts ($575). Multiplying the $4 million cost basis claimed by the partnership by this fraction (144/575), the partnership computed a $1,001,739 depreciation deduction.

The partnership relied on estimates of total gross box office receipts provided to it by its distributor, Allied Artists, after the results of the movie's release in Escanaba, Mich.

[10]See also Rev. Rul. 78–28, 1978–1 C.B. 61.

depreciation. Where the principal amount of the nonrecourse note unreasonably exceeds the fair market value of the property securing the note, the face amount of the note will not be included in the depreciable basis, irrespective of the doctrine of *Crane v. Commissioner*, 331 U.S. 1 (1947). *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Based on the record, it is clear the amount of the $3,540,000 note herein unreasonably exceeded the fair market value of the movie. Accordingly, the note is not included in the depreciable basis of the movie. See *Siegel v. Commissioner, supra; Brannen v. Commissioner*, 78 T.C. 471 (1982).

Alternatively, petitioners argue for the first time on brief that they are entitled to depreciate the film under an accelerated method. Petitioners admit that generally a change in a taxpayer's method of depreciation constitutes a change in the taxpayer's method of accounting which normally requires the consent of respondent (see sec. 446 (e)), and no such consent was given herein. However, petitioners, relying on *Silver Queen Motel v. Commissioner*, 55 T.C. 1101 (1971), argue they have not changed their method of accounting.

In *Silver Queen Motel*, the taxpayer had erroneously attempted to use the double declining balance method of depreciation for "used" assets in the first year those assets were placed in service. This Court permitted the taxpayer to "adopt" a permissible method of depreciation even though respondent's consent had not been granted. Since the taxpayer did not have the opportunity to regularly compute depreciation, we held the taxpayer could not be considered to have changed its method of accounting. Thus, no consent was required. See 55 T.C. at 1105.

The facts herein are distinguishable. Whereas the taxpayer in *Silver Queen Motel* had chosen an unacceptable method of depreciation, petitioners herein chose a clearly acceptable method (income forecast) but simply used such method improperly. Even the case upon which petitioners rely recognized that once a taxpayer selects an acceptable method of depreciation, he may only change that method with the consent of respondent. See 55 T.C. at 1105; see also sec. 1.167(b)–0(c), Income Tax Regs. Accordingly, since they chose an acceptable

method of depreciation in the first instance, petitioners cannot now change that method absent the required consent. See *Mitchell v. Commissioner*, 42 T.C. 953, 968 (1964).[11]

## *Investment Tax Credit*

With respect to its purchase of "Sea Wolf," New London reported the movie was "new" section 38 property with a $4 million basis and a useful life greater than 7 years, which qualified for the investment credit. On their 1975 individual Federal income tax return, petitioners claimed $292,400 as their share of that basis which resulted in a $29,240 investment tax credit. In his notice of deficiency, respondent disallowed the credit in its entirety.

The issue is whether petitioners are allowed an investment credit with respect to the partnership's purchase of "Sea Wolf." Respondent contends no investment credit is available since (1) the transaction was not entered into with a profit motive, (2) no "qualified United States production costs" were incurred (see sec. 48(k)(4)), and (3), the film was not "new" section 38 property when acquired by the partnership. See sec. 48(k)(1)(A)(i). Petitioners dispute each of respondent's contentions. As to respondent's arguments based on section 48(k), petitioners do not dispute that that section purports to effectively disallow the credit, but they do claim section 48(k) has unconstitutionally been applied to them retroactively.

Initially, we face the question of whether the partnership entered into the transaction with the objective of making a profit. Petitioners must establish that the activity was entered into with the intent and objective of realizing a profit. *Siegel v. Commissioner*, 78 T.C. 658 (1982); *Brannen v. Commissioner*, 78 T.C. 471 (1982). In determining whether the partnership engaged in the activity for profit, all relevant facts and circumstances are to be taken into account. *Siegel v. Commissioner, supra.*

Based on the entire record, the evidence supports a finding that the partnership entered the transaction with an actual and honest objective of making a profit. At all times, the

---

[11]On the question of whether consent is necessary to change from a clearly incorrect accounting method, see *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 682 n.208 (1980).

partnership was conducted in a businesslike manner. It contracted with Allied Artists, an unrelated and reputable company in business since 1936, to distribute the movie. The movie was based on a well-known novel written by a famous American novelist, Jack London. The Court viewed the movie and was impressed with the quality of acting, although we felt the timing of the lip movement with the dubbing could be improved.

Even though the stated selling price was $4 million, petitioners are correct in their argument that profit, in this case, is not to be measured against the amount of the $3,540,000 nonrecourse note. By the terms of the purchase agreement, no payments on that note were required until $1,540,000 of net film rentals was generated. Thus, immediately after it recouped its cash outlay, the partnership was entitled to retain its share of net rentals. This is profit.

Moreover, Twentieth Century Fox, a widely known international corporation, purchased much of the rest of the worldwide distribution rights in the same movie for similar terms.

The movie industry is a highly speculative business but such does not belie a profit motive; higher risk commands bigger reward. Further, there are no overtones of personal pleasure or recreation often involved with activities not engaged in for profit. See sec. 1.183–2(b)(9), Income Tax Regs. We recognize substantial tax motives played a part in this setting, but on the basis of this record, we find the partnership acquired the movie with the requisite profit motive. See and compare *Siegel v. Commissioner, supra*, and *Brannen v. Commissioner, supra*. Since we find the partnership held the requisite profit motive, we address the constitutional question.

Section 38(a) allows a credit against tax for investments in certain depreciable property, also referred to as section 38 property. Generally, the amount of credit is based on a taxpayer's depreciable basis in the property. See sec. 46(a)(2). However, with respect to movie and television films, the amount of the credit is based not on the depreciable basis but on the amount of "qualified United States production costs." Sec. 48(k)(4). Since the movie was produced in Germany and no U.S. production costs were incurred, there is no dispute that section 48(k)(4), if constitutionally applicable, entitles petitioners to no investment credit.

Petitioners contend, however, the retroactive application of section 48(k)(4) is unconstitutional. Current section 48(k) was enacted on October 4, 1976, as part of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1525, 1591, sec. 804. Section 804(e)(1) of that act provides section 48(k) applies to taxable years beginning after December 31, 1974.[12] Thus, even though it was enacted on October 4, 1976, section 48(k)(4) applies to movies released in taxable years beginning after December 31, 1974. Petitioners contend the retroactive effect given the statute is so arbitrary and capricious as to amount to a denial of due process. We do not find any constitutional infirmity in the retroactive application of the statute.

The presumption of validity which attaches to all acts of Congress is "particularly strong in the case of a revenue measure." *Southeast Equipment Corp. v. Commissioner*, 33 T.C. 702, 705 (1960), affd. 289 F.2d 493 (6th Cir. 1961). The paramount Government interest in obtaining adequate revenues commands such respect for revenue statutes. The test to determine whether the retroactive application of an income tax statute is unconstitutional is whether "the nature of the tax and the circumstances in which it is laid * * * is so harsh and oppressive as to transgress the constitutional limitation." *Welch v. Henry*, 305 U.S. 134, 147 (1938).

Legislative judgment with respect to the investment credit is to be accorded special weight. Purely a creature of statute, the credit is in the nature of a Government subsidy designed to encourage capital investment. The investment credit has experienced a tumultuous path in its relatively short history. Congress first enacted the investment credit in 1962. Thereafter, it was suspended in 1966, reinstated in 1967, repealed in 1969, resurrected in 1971, enhanced in 1975, and otherwise modified almost every year. See *Zuanich v. Commissioner*, 77 T.C. 428, 452 n. 32 (1981). It is readily apparent the investment credit is prone to frequent changes in Congress' notion of the perceived needs of the economy. As this Court noted: "[it is

---

[12]Certain provisions of sec. 48(k), not directly relevant to this issue, namely sec. 48(k)(1), were made applicable to any motion picture film placed in service in any taxable year beginning before Jan. 1, 1975. See *Siegel v. Commissioner, supra*, wherein the investment credit was disallowed with respect to a movie placed in service in 1974.

not] for us * * * to question the wisdom of the restrictions on the investment credit." *Zuanich v. Commissioner, supra* at 451.

Prior to the Tax Reform Act of 1976, the state of the law with respect to the investment credit as it pertained to films was largely an unsettled affair. Section 48(k) is the congressional promulgation of a comprehensive set of rules designed to clarify this area. Section 48(k)(4) provides the amount of the investment credit is to be based on U.S. production costs. Since one of the major purposes of the investment credit is to create jobs in the United States, the statute is entirely consistent with the policy underlying the investment tax credit.[13] When the movie is produced in a foreign country, such policy is not furthered.

Congress has many times given a revenue measure an effective date prior to the date of actual enactment. The U.S. Supreme Court consistently has held that this practice does not per se violate the due process clause of the Fifth Amendment. See *United States v. Darusmont*, 449 U.S. 292 (1981), and cases cited therein. In addition, the Revenue Acts of 1918 and 1926 were applicable to an entire calendar year that had expired prior to their enactment (see *United States v. Darusmont, supra*), and the U.S. Supreme Court has upheld a State revenue measure which was applied to a taxable year ending almost 15 months before its passage. *Welch v. Henry, supra.* We are aware of no Federal income tax statute that has ever been held invalid by the U.S. Supreme Court for its retroactive applicability.[14] In view of the foregoing, we find nothing so extenuating as to command a different result in this case.[15]

---

[13]Generally stated, the policy of stimulating the economy of the United States is furthered by the operation of sec. 48(a)(2) which disallows the investment credit for property used predominately outside the United States. With respect to movie and television films, however, that limitation has been repealed (see sec. 48(k)(4)(a)), and, in effect, replaced with the requirement the credit be based on U.S. production costs. Thus, it is possible the movie will qualify for the investment credit if it is shown only in foreign countries so long as it was produced in the United States.

[14]Compare *Nichols v. Coolidge*, 274 U.S. 531 (1927) (retroactive application of estate tax held unconstitutional); *Untermyer v. Anderson*, 276 U.S. 440 (1928) (retroactive application of gift tax held unconstitutional). We are not dealing with a tax in the nature of a civil penalty. See *United States v. Constantine*, 296 U.S. 287 (1935).

[15]Petitioners have not impressed us with their claims of "harsh and oppressive" circumstances as applied to themselves. Through their participation in this tax shelter as structured, petitioners anticipated a 1975 tax benefit of $77,381.90 when they invested $50,000. Even without their $29,240 share of investment credit, petitioners anticipated tax

There is no constitutional violation of due process in applying section 48(k)(4) to a taxable year prior to its enactment.[16] Accordingly, no investment credit is allowable either to the partnership or to petitioners with respect to their interest in "Sea Wolf."

## Fees

On its 1975 Federal partnership return, New London deducted $20,000 for compensation paid to the general partners, $33,000 in legal fees, and $2,500 for promotional expenses. The return showed $4,000 of nondeductible organizational expenses. In his notice of deficiency, respondent disallowed petitioners' share of the above deductions in their entirety.

The issue is whether any of the above fees are deductible by the partnership. Respondent contends no deduction is allowable since, in all instances, the fees represent nondeductible capital expenses.[17] Petitioners contend the fees are ordinary and necessary expenses directly related to the business of the partnership. For the following reasons, we find for respondent with respect to all fees.

To be deductible by the partnership, the fees must satisfy the requirements of section 162(a). Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In determining whether any of the fees are deductible under section 162(a), "we look to the nature of the services performed [for which the fees were paid] * * *

---

savings close to their cash investment. Under these circumstances, we do not take their claims seriously.

We also note the proposed amendment had been under public discussion since Nov. 12, 1975, H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, and petitioner signed the subscription on Nov. 24, 1975.

[16]The Committee reports state, "However, for the past [taxable years beginning before Jan. 1, 1975], there has not been a U.S. production test in connection with movie films, and the committee does not believe it would be appropriate to impose such a test retroactively." H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 888, ordered to be printed on Nov. 12, 1975; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 232. That statement is not inconsistent with the result herein. Even though the relevant legislation was at the committee level in late 1975 and was enacted in 1976, Congress clearly intended the U.S. production test to apply to movies released in taxable years beginning after Dec. 31, 1974.

[17]Respondent also contends the fees are not deductible since the partnership had not entered into an activity for profit. We have previously disposed of this issue.

rather than to their designation or treatment by the partnership." *Estate of Boyd v. Commissioner*, 76 T.C. 646, 658 (1981), quoting *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Payments allocable to organizational expenses and acquisition costs must be capitalized. Sec. 263; *Woodward v. Commissioner*, 397 U.S. 572, 576 (1970); *Estate of Boyd v. Commissioner, supra*. Petitioners bear the burden of proving what portion of the fee is allocable to nondeductible capital portions and to deductible expense portions (*Estate of Boyd v. Commissioner, supra*), and such allocation must reasonably comport with the value of the services performed. *Merians v. Commissioner*, 60 T.C. 187 (1973). The fees will be treated separately.

### 1. Compensation to General Partners—$20,000

Alluding to the testimony of each general partner, petitioners claim the following services were performed for which the fees were paid:

(1) seeking professionals in the movie industry to assist in the partnership's business activities,

(2) assisting in marketing the movie,

(3) negotiating the distribution agreement with Allied Artists,

(4) dealing with the partnership's attorneys concerning business affairs, and

(5) obtaining tax advice from accountants and attorneys.

Since respondent adduced no evidence to the contrary, petitioners conclude the payments must be deductible. We cannot agree.

The testimony of the general partners, English and Jones, does not support petitioners' claim the compensation was payment for the services claimed to have been rendered. Their testimony was not much more than bare assertions that the claimed services were performed. No meaningful corroborative evidence to support their testimony was forthcoming.

Moreover, some of the services claimed to have been performed were either not performed or reflect capital expenditures. For instance, with respect to petitioners' claim that part of the fee was for seeking professionals in the movie industry to assist in the partnership's business activities, no specific instance of any attempt to seek such professional assistance or the identity of any such professional after the

formation of the partnership was given. The general partner, English, testified, "I sought out professionals in the movie industry to assist me in the partnership's activities; that is to say to find the film." Those services are connected with the acquisition of the film, clearly a capital expense.

Petitioners also claim part of the fee paid to the general partners was for negotiating the distribution contract with AA. The evidence, however, clearly refutes this contention. AA was "locked in" as the distributor before either general partner became involved in his capacity as general partner for the partnership.[18] Moreover, Jones denied having discussions with representatives of AA prior to the time the entire deal was completed. Similarly, English flatly denied any involvement in negotiations or discussions with AA at any time. Clearly, no part of the fee was attributable to either general partner's negotiating the agreement with AA. We are little more persuaded the general partners were compensated for the other services claimed to have been performed. We are given no details with respect to the general partners' obtaining tax advice or dealing with the partnership's attorneys concerning "business" affairs. Nor did either general partner engage in meaningful assistance in marketing the movie.

Rather, we are convinced the $20,000 paid to the general partners was nothing more than a fee for putting the deal together. Nearly all services referred to in the record pertain to organizing the partnership and acquiring the movie. English reviewed several films before entering the agreement, negotiated the purchase of the movie, retained counsel to create the partnership, and flew to Switzerland to close the deal. Jones's contribution consisted primarily of consulting with English on the acquisition of the movie and arranging for preacquisition appraisals of the movie. As we have noted, whether a payment is deductible by the partnership depends on the nature of the services performed and not on its designation by the partnership or the partners. The record establishes the fees of $18,000 and $2,000 paid to English and Jones, respectively, were payments for arranging the partner-

---

[18]The record does not disclose how AA was selected as the distributor and is unclear as to who negotiated the AA distribution agreement.

ship and for acquiring the movie and, thus, constitute nondeductible capital expenditures.[19] Even if we were to assume a portion of the fees were in payment for services rendered to the partnership in the ordinary course of its business, we would be in no position to allow a deduction for such a portion since we are given no basis for either valuing the services performed or allocating between deductible and nondeductible expenses. Thus, petitioners must capitalize their share of the $20,000 fee paid to the general partners.

## 2. Legal Fee—$33,000

In 1975, New London paid $37,000 in legal fees to the law firm. Of that amount, New London deducted $33,000 as a current expense and capitalized $4,000 as an organizational expense. The issue is whether the $33,000 legal fee or any portion thereof is currently deductible.

In return for the entire $37,000 fee, the law firm performed the following legal services:

(1) tax planning that went into the structuring of the partnership,
(2) drafting the partnership agreement,
(3) acquiring the movie which included a trip to Switzerland to close the deal,
(4) reviewing terms of the distribution agreement with AA, and
(5) soliciting limited partners which included a screening held in Chicago so as to give the limited partners and their representatives a chance to see the movie before investing.

Petitioners contend the entire $33,000 legal fee was directly related to the business of the partnership and is, therefore, a deductible expense. Respondent contends the entire legal fee is nondeductible since it was paid in connection with the organization of the partnership and the acquisition of the film. We find for respondent.

Acknowledging legal fees related to the organization of the partnership and to the acquisition of the movie are capital expenses, petitioners do not question the portion of the fee

---

[19]Under the partnership agreement, the fees were guaranteed payments under sec. 707(c). The law is settled that a guaranteed payment is not automatically deductible but must satisfy the requirements of secs. 162 and 263. *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976).

attributable to drafting the partnership agreement, to acquiring the movie (which included a trip to Switzerland),[20] and to soliciting potential limited partners are capital expenses. Petitioners assert that $4,000, which was treated as a capital expense on the partnership's Federal tax return, accurately reflects the value of those services.

Petitioners rely on the testimony of one of the partners of the law firm. That partner's testimony provided little more than a description of the services performed. No bill itemizing those services or the time spent on each activity was introduced. His testimony did not, even in the broadest sense, provide clues as to this information. Without any substantive basis as to the value of the various services performed, we are unable to make an allocation between any deductible and nondeductible portions of the fee.

Even if we accept petitioners' position that the nondeductible portion of the fee is attributable to the following services— drafting the partnership agreement, soliciting investors, acquiring the movie, and closing the deal in Switzerland—we are not convinced $4,000 accurately reflects the value of those services. That value represents a very small portion of the entire $37,000 fee. And, of course, it was in the partnership's best interest to allocate as much of the fee as possible to the deductible portion. Petitioners would have us believe the remaining $33,000 was attributable to the tax planning that went into structuring the partnership and to reviewing terms of the distribution agreement with AA.[21] In light of an inadequate basis for valuing the variety of services performed and the questionable allocation made by the partnership, we reject petitioners' allocation. Petitioners have failed to estab-

[20]Lloyd Shefsky, the partner who made this trip on behalf of the partnership, was already in Europe on other business.

[21]We accept petitioners' contention for purposes of argument, only, and we express no opinion on whether the tax planning that went into the structuring of the partnership is currently deductible. See secs. 212(2) and 212(3). Nor do we pass on the question whether fees incurred in negotiating and preparing the AA distribution agreement are currently deductible. It is doubtful, however, whether the expenses related to the distribution agreement escape the web of capitalization either as organizational or preoperational expenses. See *Estate of Boyd v. Commissioner*, 76 T.C. 646, 666 (1981); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 566–567 (1979), affd. 633 F.2d 512 (7th Cir. 1980).

lish what portion, if any, of the legal fee is currently deductible. Thus, the entire $33,000 fee must be capitalized.

### 3. Promotional Fee—$2,500

In 1975, New London paid Jones $2,500 for "activities PR-wise through the entire life of that movie." The partnership deducted this fee as a current expense. In his notice of deficiency, respondent disallowed the deduction.

Petitioners contend the promotional fee was an ordinary and necessary partnership business expense deductible under section 162. Respondent contends the fee must be capitalized as a prepaid expense. Again, we find for respondent.

Payments for future services have been held to be capital expenditures. *Estate of Boyd v. Commissioner*, 76 T.C. 646, 667 (1981); *Syracuse Washington Machine Corp. v. Commissioner*, 17 B.T.A. 11 (1929); *Farming Corp. v. Commissioner*, 11 B.T.A. 1413 (1928).[22] The basis of these decisions is that the prepayment of expenses generally results in the creation of an intangible asset, namely prepaid services, which must be capitalized and amortized over the years of its exhaustion.

Here, Chuck Jones was paid a "front end" fee for services to be rendered throughout the life of the movie. Jones was not being paid for services performed in 1975 only. Such fee was attributable to services to be performed over the entire life of the movie. The $2,500 promotional fee should be capitalized.

In summary, petitioners have failed to establish that any of the fees paid—$20,000 compensation to general partners, $33,000 legal fee, and the $2,500 promotional fee—or any portion thereof, are currently deductible expenses as opposed to respondent's contention they are capital expenses. Petitioners have neither asserted a claim for nor suggested any method of calculating what portion of the fees, if any, are amortizable for the remaining days of 1975. Thus, we allow no deduction in 1975 for any amounts attributable to those fees. See Rule 142(a), Tax Court Rules of Practice and Procedure. Nor is any deduction allowed in 1975 for depreciation of the movie. Further, the partnership is allowed no investment

---

[22]See also *Maple v. Commissioner*, T.C. Memo. 1968–194, affd. 440 F.2d 1055 (9th Cir. 1971); *Blitzer v. United States*, Ct. Cl. 426–76 (Trial Div., Mar. 12, 1981), 47 AFTR 2d 81–1005, 81–1 USTC par. 9262.

credit with respect to its purchase of the movie. To reflect the foregoing,

*Decision will be entered for the respondent.*