JOHN A. SAMOHIN and HRYSOULA SAMOHIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Samohin v. Commissioner
Docket Nos. 8223-82, 33575-83.
United States Tax Court
T.C. Memo 1986-164; 1986 Tax Ct. Memo LEXIS 443; 51 T.C.M. (CCH) 912; T.C.M. (RIA) 86164; April 22, 1986. Fred A. Foley, for the petitioners. Patrick J. Gray, Jr., for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In timely statutory notices of deficiency and by amendment to his answers herein, respondent determined deficiencies in petitioners' Federal income tax liabilities and additions to tax, as follows: Docket
Additions to Tax
No.
Year
Deficiencies
I.R.C. Section 6653(a) [1]
8223-82
1978
$94,075.00
$4,658.78
33575-83
1979
145,198.10
7,259.90
33575-83
1980
14,473.65
2,864.08
*444 These cases were consolidated by Order of this Court dated September 28, 1984. After a partial settlement, the primary issues remaining for decision are: (1) Whether petitioners received unreported income from their sole proprietorship in 1978 and 1979 in excess of amounts conceded; and (2) whether petitioners are liable for the additions to tax set forth above. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners John A. Samohin ("John") and Hrysoula Samohin ("Hrysoula") are husband and wife and resided in Sterling Heights, Michigan, when they filed the petitions herein. Petitioners timely filed joint Federal income tax returns for 1978, 1979, and 1980. John is a native of Galate, Greece. He immigrated to the United States in 1967 at the age of 24. John was trained in Greece as a machinist and became employed in the United States in that capacity from 1967 through 1974 by, among others, Chrysler Corporation and Ford Motor Company. During those years, John became a citizen of the United States, accumulated a small savings, *445 and worked part time to establish his own machine shop. In 1974, John resigned his employment at Ford Motor Company, and with $18,000 in savings, he began to operate his own machine shop on a full-time basis as a sole proprietor. He did business under the name of John Sam's Tool Company (hereinafter referred to as "Sam's Tool Company"). On December 23, 1980, Sam's Tool Company was incorporated under the laws of the State of Michigan. Sam's Tool Company specialized in making customized parts for machinery and equipment used in the automotive industry. During the years in issue, Sam's Tool Company won bids from and completed jobs for five customers, namely, Chevrolet Motor Company ("Chevrolet"), F. Joseph Lamb Company ("Lamb"), O'Keller Tool Company ("O'Keller Tool"), Michigan Precision Industries, Inc. ("MPI"), and Punchcraft Company ("Punchcraft"). As the proprietor of Sam's Tool Company, John prepared the bids, participated in all aspects of the manufacturing process, supervised 12 employees, and managed all other aspects of the business. Hrysoula is a native of Athens, Greece. Her parents, Demetrius and Maria Kateri, had been the owners and proprietors of a retail furniture *446 store in Athens from the end of World War II until Demetrius Kateri's death in 1964. Many of the customers of the furniture store were U.S. military personnel stationed at a nearby U.S. military base. The military personnel often purchased furniture at the store and paid cash for the furniture with U.S. dollars. Because the value of the U.S. dollar was understood to be more stable than the value of the Greek drachma, Mr. and Mrs. Kateri accumulated the U.S. dollars earned in their business. Mr. and Mrs. Kateri agreed that the U.S. dollars they were able to save would be given to Hrysoula, their only child, as a dowry at the time of her marriage. Upon the death of Demetrius in 1964, Mr. and Mrs. Kateri had accumulated U.S. $260,000. Mrs. Kateri inherited from her husband this money, as well as the furniture store, three apartments, and three parcels of vacant real property. The U.S. $260,000 was kept in a locked chest in the attic of the Kateri home. In 1970, Hrysoula's mother showed her the money in the chest and explained to Hrysoula her intent eventually to give Hrysoula the U.S. $260,000. The money was wrapped in paper, tied in small bundles, and covered with old clothes. *447 The money consisted primarily of U.S. $50 and U.S. $100 bills, but smaller denomination bills also were included. While vacationing in Greece in the summer of 1973, John met Hrysoula and shortly thereafter, in October of 1973, petitioners were married in Athens. At the time of the marriage, Maria Kateri gave Hrysoula approximately U.S. $50,000 as part of the dowry money, and she informed Hrysoula and John that the remaining U.S. $210,000 would be given to Hrysoula over a period of time, provided the marriage was successful. In traveling to the United States with her new husband, Hrysoula hid the U.S. $50,000 on her person because she understood it was illegal to transport large amounts of U.S. currency outside of Greece. After petitioners arrived in the United States, Hrysoula tied the $50,000 in small bundles and hid it in a two-foot-square box in a closet in petitioners' home In Michigan. The remaining U.S. $210,000 which Hrysoula's mother had in her home in Greece was given to Hrysoula over the next six years. In June of 1975 and in December of 1976, Maria Kateri traveled by air to the United States to visit petitioners. On each of those trips, Mrs. Kateri hid approximately *448 U.S. $50,000 of the dowry money on her person, and upon her arrival in the United States, gave it to Hrysoula. In June of 1978 and in June of 1979, Hrysoula visited her mother in Greece. On each of those trips Hrysoula returned to the United States carrying with her approximately U.S. $50,000 of the dowry money. The money was hidden on her person in a manner similar to the manner in which she had carried the first U.S. $50,000 into the United States in 1973.Neither Mrs. Kateri nor Hrysoula reported to Greek officials or U.S. customs officials that they were transporting large amounts of U.S. currency into the United States from Greece. [2]
From 1974 through 1979, Hrysoula frequently received letters from her mother containing small amounts of U.S. currency from the dowry, totaling approximately U.S. $10,000. By September of 1979, Hrysoula had received the entire U.S. $260,000 promised to her by *449 her mother, and she received no dowry money from her mother thereafter. All of the U.S. currency Hrysoula received from her mother was kept in the same box in petitioners' home. Hrysoula considered the dowry money her own, and she exercised complete control over the use of the money. Some was used for family vacations and necessities. Several times during the years 1973 through 1977, John asked Hrysoula to allow a portion of the dowry money to be used to expand his business. Hrysoula refused John's requests because she was not completely secure in her marriage and she did not then want to commit the dowry money to the business. By 1977 petitioners had two children, and Hrysoula had become confident that her marriage to John would be successful. Hrysoula thereafter began to make portions of the dowry money available to John's business by depositing portions of it to the checking account of Sam's Tool Company, and she continued to do so throughout 1978 and 1979. Hrysoula also routinely made deposits to the bank accounts of Sam's Tool Company of receipts from the business. She often deposited dowry money into the checking account at the same time she deposited business receipts *450 into the account, using the same deposit slips for all the money. Respondent's agent made an initial contact with petitioners in January or February of 1979 regarding an audit of their 1977 joint Federal income tax return. Petitioners heard nothing further from the agent until early 1980, by which time (because petitioners were under the impression the audit had terminated) petitioners had discarded some of their records. Some records also were destroyed when the basement in which records of Sam's Tool Company were kept was flooded. In 1980, another of respondent's agents was assigned the audit of petitioners' 1977 return. He expanded the scope of the audit to include 1978, 1979, and, eventually, 1980 and 1981. During the audit, petitioners cooperated with respondent's agent in every respect and explained to the agent that Hrysoula had received U.S. $260,000 as a dowry from her mother and that approximately $180,000 of it had been deposited to the checking account of Sam's Tool Company in 1978 and 1979. Petitioners obtained an affidavit from Mrs. Kateri, made on May 30, 1980, in Athens, Greece, in which Mrs. Kateri stated that she had given Hrysoula U.S. $50,000 at the time *451 of her marriage in 1973, and U.S. $210,000 periodically from 1973 to 1979. At the conclusion of the audit, respondent issued "nochange" letters with respect to petitioners' 1977 and 1981 joint Federal income tax returns. With respect to petitioners' 1980 joint Federal income tax return, respondent's agent disallowed certain deductions made thereon, but accepted the gross receipts of Sam's Tool Company as reported for that year. With respect to 1978 and 1979, however, respondent determined that the books and records of Sam's Tool Company did not accurately reflect the income of the business in those years. Respondent, therefore, reconstructed the income of Sam's Tool Company for 1978 based upon bank deposits made in that year to the checking account of Sam's Tool Company with the Detroit Bank and Trust Company (hereinafter referred to as the "Bank"). For 1979, respondent's reconstruction of the income of Sam's Tool Company was based not only on deposits to the checking account of Sam's Tool Company but also on deposits to its savings account, to petitioners' personal checking account, and to petitioners' two personal savings accounts. Respondent determined that all deposits *452 to bank accounts of Sam's Tool Company in 1978 and 1979, other than interaccount transfers, represented gross receipts of Sam's Tool Company in those years, and that those deposits, to the extent they exceeded gross receipts reported on petitioners' 1978 and 1979 joint Federal income tax returns, represented additional, unreported income of Sam's Tool Company. Respondent's determinations were reflected in his notice of deficiency, as follows: Reported
Total
Gross
Amount of
Year
Deposits [3]
Receipts
Unreported Income
1978
$492,118
$419,629
$72,489
1979
886,997
695,621
191,376
Respondent also identified certain payments to Sam's Tool Company in 1978 and 1979 that petitioners did not deposit in those years to any of the examined bank accounts. Because those amounts were not included in respondent's bank deposits analysis, those amounts (namely, $80,789 in 1978 and $31,504 in 1979), in amended answers, were determined to be additional income of Sam's Tool Company. At trial, *453 testimony was offered by petitioners, by Mrs. Kateri, by the Bank's vice president, and by respondent's revenue agent. A certified public accountant also offered expert testimony for petitioners concerning, among other things, the estimated gross receipts of Sam's Tool Company in 1978 and 1979. OPINION The primary issue in these consolidated cases requires a factual determination of the source of certain deposits made to bank accounts of Sam's Tool Company in 1978 and 1979. Respondent contends that, excluding interaccount transfers, all deposits to the checking account of Sam's Tool Company in 1978 and to its checking and savings accounts in 1979, represent business income of Sam's Tool Company. Petitioners do not dispute that they inadvertently may have failed to report on their Federal income tax returns for the years in issue deposits to the bank accounts totaling $24,670 in 1978 and $81,383 in 1979. Petitioners contend, however, that certain additional deposits to the bank accounts (namely, $49,121 in 1978 and $128,352 in 1979) are attributable to the dowry received from Mrs. Kateri and are excludable from gross income under section 102(a). [4]
*454 As a preliminary matter, the parties herein dispute whether petitioners or respondent bears the burden of proof as to the amount and taxability of deposits made to bank accounts of Sam's Tool Company that were not included in petitioners' Federal income tax returns. In light of our resolution of this issue on the merits, a decision herein as to the placement of the burden of proof would not affect our decision. We need not and do not decide that issue. Respondent's use of the bank deposits method for computing income has long been sanctioned by this and other courts. See Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977), and cases cited therein. Bank deposits are prima facie evidence of income. Estate of Mason v. Commissioner;supra; Hoefle v. Commissioner,114 F.2d 713 (6th Cir. 1940), affg. a Memorandum Opinion of this Court. A likely taxable source is present in this case for deposits to the bank accounts of Sam's Tool Company (namely, business receipts of Sam's Tool Company). Holland v. United States,348 U.S. 121, 138 (1954). Whether unexplained deposits *455 to the bank accounts of Sam's Tool Company constitute nontaxable gifts to petitioners or taxable receipts of the business is a question of fact. Commissioner v. Duberstein,363 U.S. 278, 289 (1960); Smith v. Commissioner,305 F.2d 778, 780 (3d Cir. 1962), affg. a Memorandum Opinion of this Court. In Commissioner v. Duberstein,supra, the Supreme Court commented on the imprecise nature of such a factual determination as follows: Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. * * * [363 U.S. at 289.] Respondent points to a number of factors which he contends highlight *456 the implausibility and incredibility of petitioners' assertion that they received a cash dowry in the amount of U.S. $260,000 and that a substantial portion of the dowry was deposited to the bank accounts of Sam's Tool Company in 1978 and 1979. Respondent contends that it is unlikely that Demetrius and Maria Kateri's retail furniture store in Athens, Greece, which was sold for the equivalent of U.S. $5,000 or $6,000, could generate $260,000 in U.S. currency. Further, respondent notes that $50 and $100 bills are not widely circulated today and were, no doubt, less likely to have been circulated during the years 1945 through 1964. Respondent points out that the deposit slips do not indicate that cash was deposited to the bank accounts and that if petitioners had made cash deposits on certain occasions in excess of $10,000, as they allege they did, the Bank would have been obligated to complete and file with Federal authorities a "currency transaction report" reflecting each such deposit. Since the Bank did not file any currency transaction reports with respect to deposits in excess of $10,000 made by petitioners, respondent argues that no cash deposits in excess of $10,000 were made *457 by petitioners. Respondent contends further that if petitioners did receive gifts of cash from Mrs. Kateri, it is unlikely they would have deposited the cash to the checking account of Sam's Tool Company in odd-dollar amounts (such as $1,028 deposited on February 10, 1978, or $5,481 deposited on April 30, 1979), rather than in round-numbered amounts. Respondent argues that the pattern of deposits of alleged dowry money made by petitioners is virtually indistinguishable from the pattern of deposits made by petitioners of checks received from customers of Sam's Tool Company. [5]
Respondent also points out that on four separate occasions deposits of alleged dowry money were recorded as two separate amounts on the same deposit slips. [6] Respondent argues that deposits from the same source (namely, the dowry gift) likely would not have been recorded on a single deposit slip as two separate odd-dollar amounts. Petitioners are not the first to assert *458 before this Court that they were beneficiaries of large cash gifts or inheritances which they secreted away for many years. [7] Regardless of who bears the burden of proof in a particular case, such claims must be scrutinized carefully. We have so examined the totality of the facts and circumstances before us in this case and the credibility of the actions and testimony of petitioners herein and of Mrs. Kateri. Having done so, we believe that petitioners did receive a dowry from Mrs. Kateri in the amount of U.S. $260,000, and that a significant portion thereof was deposited to the bank accounts of Sam's Tool Company in 1978 and 1979.
Hrysoula's testimony with respect to the manner of and the reasons for transporting, storing, and depositing funds received from her mother was entirely credible. *459 The testimony of John and particularly of Hrysoula's mother, also was completely credible. Their testimony is supported by the customs within the Greek community (as explained by petitioners) for parents to give dowries to newly married children. It is supported by the presence of the retail furniture store in Greece which did business for many years in U.S. dollars with U.S. military personnel. It is supported by the death of Hrysoula's father and the relationship between the dowry and the intent of Hrysoula's father and mother to transfer a portion of their estate to Hrysoula. The mode of transporting the funds out of Greece into the United States and the reasons therefor were candidly and forthrightly explained and were entirely believable. Petitioners' testimony also was consistent with the explanations petitioners gave to respondent's agents from the initiation of the audit. The points raised by respondent are not necessarily inconsistent with petitioners' assertion that they made deposits of dowry money to the bank accounts of Sam's Tool Company. It is common knowledge, and the Bank's vice president acknowledged in his testimony herein, that banks often fail to report *460 cash transactions in excess of $10,000. The Bank's vice president also testified that tellers employed at the Bank often fail to correct deposit slips on which cash deposits erroneously are recorded in the space provided for deposits of checks. We have no reason to doubt the truthfulness of the vice president's testimony, and respondent has pointed to none. In explanation for the fact that amounts deposited to the checking account of Sam's Tool Company were odd amounts, petitioners testified that they tied the money they received from Mrs. Kateri in bundles of varying size and amount, and placed the bundles of money in a storage box in their home. When Hrysoula or John made a deposit of dowry money, they simply would take one or two bundles of the money to the Bank, count it, and record the amount of each bundle on a separate line of the deposit slip. The credibility of petitioners' testimony is further corroborated by a comparison of total payments to Sam's Tool Company (established by respondent through contacts made with the companies doing business with Sam's Tool Company) with total gross receipts of Sam's Tool Company reported on Schedule C of petitioners' tax returns *461 for 1977 through 1980. That comparison is reflected below: Total Payments
Total Gross Receipts
As Per Customers
Reported on Tax
Year
of Sam's Tool Company
Returns
1977
$277,364
$277,364
1978
428,790
419,629
1979
763,432
695,621
1980
583,169
583,169
We note that a high percentage of the total gross receipts established through contacts with customers of Sam's Tool Company was reported on petitioners' tax returns. If the additional $260,000 in deposits to the bank accounts actually represented receipts from customers, as respondent claims, one would have expected that such a contention would have been borne out in the information respondent received from the customers. Petitioners have been forthright in their concession of certain amounts of unreported income (namely, $9,670 in 1978 and $71,463 in 1979) and have conceded additional amounts (namely, $15,000 in 1978 and $10,000 in 1979), as an estimate of unreported receipts earned by Sam's Tool Company from O'Keller Tool. If petitioners were fabricating the entire Greek Dowry story, it is likely they would have claimed all of the amounts determined by respondent to be unreported income *462 of Sam's Tool Company in 1978 and 1979 to be part of the nontaxable dowry. We reiterate that from petitioners' first contacts with respondent's agents until the time of trial, petitioners have provided the same, consistent explanation for amounts determined by respondent to be unreported receipts. Through the testimony of a certified public accountant, petitioners offered evidence that an accounting error was made in 1980 by petitioners' former tax return preparer in converting the books of Sam's Tool Company from an accrual basis for financial purposes to a cash basis for tax purposes. The accountant then opined that if the same error that was made in 1980 by the tax return preparer was made in 1978 and 1979 when he prepared petitioners' tax returns for those years, the gross receipts of Sam's Tool Company reported on the tax returns for those years would have been understated by amounts that are not significantly different from the amounts petitioners now concede were incorrectly omitted from the tax returns. The certified public accountant also testified that for the years 1980 through 1983, the average labor cost of Sam's Tool Company was 21.52 percent of gross receipts. Using *463 the undisputed labor costs for the years 1978 and 1979, and projecting gross receipts therefrom on the basis of the same factor of 21.52 percent, the accountant estimated that actual gross receipts from the business were $451,138 in 1978 and $732,365 in 1979. Those amounts are close to the gross receipts reported on the tax returns (namely, $419,629 in 1978 and $695,621 in 1979). The inference, of course, that can be drawn from the above testimony is that, with the exception of amounts conceded by petitioners, the tax returns generally reported the correct gross receipts of Sam's Tool Company and that the significant deposits to the bank accounts in excess of reported gross receipts came from a source other than the business. We do not necessarily accept the testimony of the accountant as correct, but we do note its tendency to further corroborate petitioners' testimony concerning the nontaxable source of significant deposits to the bank accounts. Based upon all of the evidence, we conclude that of the deposits made to the bank accounts of Sam's Tool Company, $47,819 in 1978 and $109,993 in 1979 represented nontaxable funds received by petitioners from Mrs. Kateri as a dowry. *464 The balance of the deposits made to the bank accounts (namely, $24,670 in 1978 and $81,383 in 1979) have not been shown to be nontaxable receipts, and petitioners no longer contest the taxability thereof. In addition, in amended answers, respondent has identified additional receipts of Sam's Tool Company in 1978 ($80,788.97) and 1979 ($31,504) which were not deposited into the bank accounts and therefore were not part of the bank deposits analysis. Petitioners do not seriously contest the taxability of these additional receipts. We find that they are taxable to petitioners in the year of receipt. Also is an amended answer, respondent alleges that an additional $1,526 was deposited to the savings account of Sam's Tool Company in 1979, and respondent alleges that the $1,526 constitutes additional income to petitioners. Petitioners again do not seriously contest the taxability in 1979 of this additional amount deposited to their savings account. They point out, however, that the correct amount of these additional deposits is $1,466.08, not $1,526. We find that the correct amount of the additional deposits to the savings account was $1,466.08. That amount is also taxable to petitioners *465 in 1979. Of the $31,504 that was not deposited into the bank accounts and that we have determined represents additional income of Sam's Tool Company, petitioners point out that two checks totaling $16,088 (one from Chevrolet in the amount of $10,922 and one from Lamb in the amount of $5,166) were cashed by petitioners in 1980. They contend that the $16,088 received when the checks were cashed in 1980 was included in the reported gross receipts of Sam's Tool Company for 1980. Because the $16,088 is now being included in petitioners' taxable income for 1979, they contend that it should be eliminated from their taxable income for 1980.Respondent contends that petitioners are not entitled to this reduction in the income of Sam's Tool Company for 1980 because no specific showing has been made by petitioners that the $16,088 actually was included in the income reported on petitioners' 1980 tax return. Unfortunately, petitioners have presented no evidence from which we can conclude that the $16,088 was included in the computation of the reported income of Sam's Tool Company for 1980. We sustain respondent on this issue. During the years at issue, petitioners acquired for use in the *466 business of Sam's Tool Company certain tangible assets. Petitioners properly deducted depreciation with respect to those assets under the straight-line method.Petitioners now contend that they should be allowed to change their method of computing depreciation on those assets to the double-declining-balance method and to increase their deductions for depreciation with respect to those assets by $4,340.00, $15,844.28, and $16,706.43 in 1978, 1979, and 1980, respectively. Respondent contends that once an acceptable method of depreciation is used by a taxpayer which results in a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business, that method must consistently be applied thereafter to that item. Sec. 1.167(b), Income Tax Regs. Prior to any change in the method of computing depreciation, petitioners must obtain respondent's consent thereto. Sec. 446(e). Wildman v. Commissioner,78 T.C. 943, 952 (1982); Mitchell v. Commissioner,42 T.C. 953, 968 (1964). Petitioners offered no evidence that they obtained respondent's consent to a change in their method of calculating depreciation. We sustain *467 respondent on this issue. Finally, respondent determined additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. [8] Petitioners concede that they failed to report a significant amount of gross receipts of Sam's Tool Company on their Federal income tax returns for 1978 and 1979, which resulted in significant understatements of their tax liabilities. Petitioners' explanations for the omissions were not adequate, and we sustain respondent's imposition of the additions to tax under section 6653(a). Decisions will be entered under Rule 155.
APPENDIX The following is a list only of deposits made by petitioner to the *468 checking account of Sam's Tool Company that were not specifically associated with a payment received from one of the customers of Sam's Tool Company. An identification is made of those deposits that petitioners contend represent deposits of dowry money. Deposits
Deposits
Deposits
Petitioners
Deposits
Petitioners
Made
Identify
Made
Identify
in 1978
Amount
as Dowry
in 1979
Amount
as Dowry
January 19
$21,249.19
January 04
$1,572.00
Dowry
February 01
887.50
17
635.60
10
1,797.50
17
3,302.00
Dowry
10
1,994.89
February 16
2,598.70
10
1,028.00
Dowry
16
967.00
March 03
20,211.47
26
3,166.00
Dowry
23
3,165.00
Dowry
March 05
2,154.00
Dowry
April 26
480.00
05
3,890.00
Dowry
26
1,194.00
14
2,781.00
Dowry
26
4,650.00
Dowry
14
3,413.00
Dowry
26
600.00
27
5,213.00
Dowry
May 05
1,800.00
April 12
954.00
05
414.00
18
3,039.00
Dowry
12
1,538.70
28
5,481.00
Dowry
17
2,546.00
May 11
2,020.00
Dowry
31
382.00
16
289.05
June 08
3,290.00
Dowry
16
4,160.00
Dowry
15
3,224.60
June 01
119.00
July 06
7,494.00
Dowry
01
2,201.00
Dowry
06
277.00
14
4,465.00
Dowry
13
5,249.00
Dowry
21
7,017.00
Dowry
13
220.00
26
17,699.00
Dowry
August 16
5,864.50
July 12
5,264.50
September 05
307.50
August 16
12,030.00
Dowry
05
280.00
23
1,313.00
Dowry
14
2,598.00
28
658.00
15
457.00
28
800.00
21
2,000.00
Dowry
28
104.00
27
7,462.70
28
1,462.00
Dowry
October 06
882.50
September 10
2,431.00
Dowry
18
2,717.00
Dowry
13
64.00
30
4,109.50
13
3,860.50
20
164.00
October 12
4,007.00
Dowry
November 10
350.00
12
5,745.00
Dowry
15
4,033.00
Dowry
12
39.20
15
290.00
12
762.50
27
100.00
12
189.00
December 01
9,029.00
26
34.00
14
1,712.00
26
443.00
14
5,585.00
Dowry
November 09
5,315.00
Dowry
14
9,910.00
Dowry
09
289.00
16
630.00
16
118.00
26
2,356.50
December 15
24,476.00
Dowry
*469 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. The international transportation of U.S. currency in amounts exceeding $5,000 is required to be declared of U.S. customs officials on Customs Form 4790, Report of International Transportation of Currency or Monetary Instruments. 31 U.S.C. § 5316 (1985)↩.
3. "Total deposits" represent total deposits to the bank accounts used in respondent's bank deposits analysis less deposits attributable to interaccount transfers.↩
4. SEC. 102. GIFTS AND INHERITANCES. (a) General Rule.--Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.↩
5. For a listing of bank deposits which petitioners contend are deposits of dowry money see Appendix.↩
6. See Appendix, with respect to deposits made on December 14, 1978, March 6, 1979, March 14, 1979, and October 15, 1979.↩
7. See, for example, Salladay v. Commissioner,T.C. Memo. 1985-86; Sammons v. Commissioner,T.C. Memo. 1984-414; J.S.M. Enterprises, Inc. v. Commissioner, 1984-269; Varano v. Commissioner,T.C. Memo. 1984-135; Mahigel v. Commissioner,T.C. Memo. 1983-529; Tucker v. Commissioner,T.C. Memo. 1983-456↩.
8. As in effect in 1978, sec. 6653(a) provided: (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩