MICHAEL BIZUB and JANIE E. BIZUB, Et Al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bizub v. Commissioner
Docket Nos. 10081-79, 3958-80, 3959-80
United States Tax Court
T.C. Memo 1983-280; 1983 Tax Ct. Memo LEXIS 506; 46 T.C.M. (CCH) 199; T.C.M. (RIA) 83280; May 23, 1983. Sheldon E. Friedman and Robert J. Kaufman, for petitioners. David D. Aughtry, for respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge Randolph F. Caldwell, Jr., for trial or other disposition, pursuant to the provisions of section 7456(c) of the Internal Revenue Code of 1954, as amended, and Rule 180 of the Tax Court's Rules of Practice and Procedure. The order of assignment provides that the post-trial procedures set forth in Rule 182 are not applicable. The Court agrees with and adopts the Special Trial Judge's opinion, which is set out hereinbelow. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: Respondent determined deficiencies in income taxes for calendar years and in amounts, as follows: Michael Bizub and Janie E. Bizub Docket No. 10081-79
Year
Deficiency
1973
$10,488.22
1974
1,118.78
1975
1,012.50
1976
873.00
*508 Arthur R. Slack
Docket No. 3958-80
Year
Deficiency
1972
$3,854.68
1973
32,872.84
1974
24,687.24
1975
5,652.15
Georgia-Carolina Land Company, Incorporated, et al. Docket No. 3959-80
Year
Deficiency
1971
$2,100.00
1972
2,100.00
1973
1,475.07
1974
13,380.17
1975
1,268.60
The issues in the Slack case, at Docket No. 3958-80, relating to two limited partnerships, The Mulberry Company [2] and Cinefai Associates, have been severed from the remaining issue in that case, and the issue in the Georgia-Carolina Land Company case, at Docket No. 3959-80, relating to Cinefai Associates was severed from the remaining issues in that case. The Slack case (insofar as it involved the issue relating to Cinefai Associates) and the severed issue in the Georgia-Carolina Land Company case were consolidated for trial, briefing, and opinion with the Bizub case at Docket No. 10081-79. *509 The issue for decision is whether the petitioner-husband Bizub, petitioner Slack, and the petitioner-corporation, each of whom was a limited partner in a partnership, Cinefai Associates (hereinafter, "Cinefai"), are entitled to deduct on their income tax returns their proportionate shares of the losses reported on the partnership's information returns for 1973, 1974, 1975, and 1976, and to their proportionate share of an investment tax credit passed through to them from the partnership -- all arising from the acquisition and distribution of a moving picture "Hurry Up or I'll Be 30" (hereinafter, "Hurry Up" or "the film"). FINDINGS OF FACT Some of the facts were stipulated. The stipulations of facts, together with the exhibits identified therein, are incorporated herein by reference. Each of the petitioners resided or had its principal place of business in or near Atlanta, Georgia, at the time the petitions were filed. The returns of all petitioners were filed with the Internal Revenue Service Center at Chamblee, Georgia. Petitioner Slack owns and controls petitioner Georgia-Carolina Land Company, Inc., and its wholly-owned subsidiary, Alabama Land and Timber, Inc. Petitioner *510 Georgia-Carolina Land Company, Inc., is a party to this action only by virtue of having filed a consolidated corporate return with petitioner Alabama Land and Timber, Inc. Consequently, reference hereinafter to petitioners includes only those petitioners who were partners in Cinefai Associates: Michael Bizub, Arthur R. Slack, and Alabama Land and Timber, Inc. Production of "Hurry Up" was commenced in 1971 and completed in early 1972 at a cost of approximately $150,000. Joseph Jacoby co-authored, produced, and directed the film, and he is and was the president and major stockholder of Tumult Productions, Ltd., a New York corporation which was the general partner of a New York limited partnership, the Cinegroup Company, the production company and the original owner of the film. "Hurry Up" was the second feature-length film produced by Mr. Jacoby.
On June 22, 1971, prior to completion of production on "Hurry Up," Mr. Jacoby entered into the first distribution contract on the film. Acting on behalf of Cinegroup, he transferred all Canadian distribution rights (for a seven-year term) to Phoenix Films, Inc. (hereinafter, "Phoenix"), a Toronto, Canada, distributor. On October 19, 1972, after *511 production of the film was completed, Cinegroup entered into an agreement with AVCO, Embassy Pictures Corporation (hereinafter "AVCO") [3] whereunder AVCO was granted all worldwide (except Canada) theatrical, non-theatrical, and television distribution rights to "Hurry Up" for a 15-year term. Under this agreement AVCO also obtained an ownership interest in the film, as indicated by the following provision: With respect to [AVCO's] territory, title and ownership of said photoplay and the negative and copyright thereof, shall be in [AVCO], and in [Cinegroup] as Tenants-in Common, subject to the terms and conditions of this agreement. With the aim of testing audience reaction and the effect of the promotional materials for the film prior to going into a major marketing area where promotional expenses would be greater, AVCO decided to open "Hurry Up" in Boston in March *512 1973.The theater selected was the Paris Theater. The opening began on March 23, 1973, and it played for three weeks, with the following results: Box Office
House
Film
Play Date
Gross
Expense
Rental
3/23/73
$4,254.73
$5,500.00
3/30/73
4,503.50
5,500.00
4/6/73
3,284.50
5,500.00
In its edition of April 27, 1973, the Christian Science Monitor gave the film a generally unfavorable review. "Hurry Up" was thereafter screened for two foreign distributors, each of whom turned the picture down. On June 11, 1973, AVCO conducted a scorecard sneak preview of "Hurry Up" at the Sutton Theater in New York City. Sixty-seven percent of those viewers who responded stated that they would recommend the picture to their friends. Those viewers paid for admission to see the scheduled feature picture, but did not pay any admission charge to see the sneak preview of "Hurry Up." On June 13, 1973, Inter-Ocean Films, Ltd., granted to a South American firm, Cinema Arte, the 35mm theatrical distribution rights for all of Mexico, Central America, South America, Curacao, and Aruba, but excluding the West Indies and Puerto Rico. [4] The term of the agreement was *513 seven years. Cinema Arte was obligated to pay a flat license fee of $25,000 ($5,000 down payment, plus a $20,000 letter of credit) and 50 percent of gross receipts in excess of $85,000.
Also during June 1973, AVCO screened the film for Judith Crist, a well-known film critic. An AVCO official prepared a memorandum indicating Ms. Crist's positive reaction to the film. Her highly favorable review was not published until the first week of the New York City opening the following November. On August 20, 1973, AVCO and Cinegroup amended their prior distribution agreement in the following respects: (a) Cinegroup was required to pay AVCO $40,000 prior to AVCO's opening the film at a mutually agreed-upon theater in New York City, which sum was to be expended by AVCO in pre-opening and opening advertising and publicity as well as for the production of the advertising campaign and production of the trailer for the picture. (b) AVCO *514 released all distribution rights except those in the United States; (c) Until AVCO received $41,000, its distribution costs incurred to date (in addition to the $40,000 mentioned above), Cinegroup was required to pay to AVCO 50 percent of all sums received by Cinegroup from distribution, exhibition, and exploitation outside the Western Hemisphere; (d) In the event that AVCO failed within 90 days of the New York City opening to manufacture 50 positive prints or to license the film for exhibition at one or more theaters in Chicago, Philadelphia, Los Angeles, and San Francisco, Cinegroup would have the right to pay AVCO $20,500 in exchange for the assignment to Cinegroup of the United States theatrical and non-theatrical distribution rights; (e) In the event that such rights were assigned back to Cinegroup, AVCO would have the right to retain all sums otherwise due Cinegroup until AVCO had received the above-mentioned $41,000; (f) In the event that such rights were not assigned back to Cinegroup, it would be entitled to certain specified percentages and amounts; (g) In the event that such rights were assigned to Cinegroup and if Cinegroup failed within seven months to manufacture *515 50 prints or to license the picture for distribution in Chicago, Philadelphia, Los Angeles, and San Francisco, AVCO would have the right to pay Cinegroup for all domestic distribution costs it had incurred and to regain the United States distribution rights; (h) Regardless of the assignment of domestic rights, AVCO released the title and ownership which it previously held in the picture; and (i) As security for the full and complete performance by Cinegroup of all the terms, conditions, warranties, and agreements of Cinegroup and for all payments required to be made to AVCO, Cinegroup mortgaged, pledged, and hypothecated to AVCO all right, title, ownership, copyright, and interest of Cinegroup in and to "Hurry Up." By letter dated August 23, 1973 (the date of June 13 is stricken), [5] Inter-Ocean Films, Ltd., accepted appointment by Cinegroup to be exclusive worldwide sales agent (except for the United States and Canada) of "Hurry Up." The term of the agency was specified to be six months, and Inter-Ocean's compensation was fixed at 15 percent of all sums paid by distributors in the territories described. In the early part of the summer of *516 1973, Jacoby and Cinegroup began efforts to dispose of their rights in "Hurry Up." A prospective sale to a partnership in Florida failed to materialize. During the latter part of the summer, probably in late August, Jacoby was put into contact, though the medium of an individual named Howard Effron (who apparently was a finder acting on Jacoby's behalf), with an individual named Richard F. Bridges, of Atlanta, Georgia. Bridges graduated from high school in Savannah, Georgia, and later received a degree in industrial management from the Georgia Institute of Technology. During college, he had sold mutual funds and life insurance, and following graduation, he went full time into the life insurance business. In approximately 1970, Bridges formed Financial Analysts, Inc. (FAI). In 1972, Bridges acquired the stock of Omnibus Corporation, a broker dealership, and changed its name to FAI Investment Analysts, Inc. (hereinafter, "Analysts"). Its principal activities were selling oil and gas interests and tax shelter programs to sophisticated investors. The only partnerships syndicated by Bridges and his entities (as opposed to having been syndicated by others and sold by Bridges and *517 his entities) prior to the formation of Cinefai, the partnership here involved, were four real estate partnerships. After having been apprised of the availability of "Hurry Up," Bridges went to New York where the film was screened for him at AVCO. Attending the screening with Bridges were Jacoby, Effron, and AVCO personnel. Bridges found the picture very appealing, and he resolved to enter negotiations looking to its acquisition. Having had no prior experience with motions pictures, Bridges retained the services of a certified public accountant name Israel Katz, associated with the New York accounting firm of David W. Katz and Co., who had negotiated the distribution agreement between Cinegroup and AVCO. Bridges relied on Katz' advice, recommendations, and judgment. In the negotiations that ultimately led to the acquisition of the film by Cinefai, Katz also represented Jacoby. Bridges also retained the services of a New York law firm, to advise him relative to the negotiations and the preparation of the necessary documents. The acquisition process involved the formation of a nominee corporation and a limited partnership, the above-mentioned Cinefai. On August 29, 1973, a *518 certificate of incorporation of Cinesai Films, Inc. (hereinafter, "Cinesai") was executed by an attorney associated with the New York law firm retained by Bridges.That certificate was filed with the Department of the State of New York on September 4, 1973. The certificate provided for only one director, and Bridges was elected such on October 3, 1973. On September 7, 1973, Cinefai was formed as a New York limited partnership. Its certificate was registered with the County Clerk of New York County on September 12, 1973. Thereafter, on October 4, 1973, the Cinefai partnership agreement was amended. Among the provisions of the amended agreement were the following: (a) The purpose of the partnership was to acquire all rights in the United States in and to "Hurry Up." (b) The capital of the partnership was to be measured in units of interest of $2,500 each, to be raised from the limited partners; (c) FAI was stated to be the general partner, which was to make no capital contribution and was not to be credited with any units of interest; and (d) All items of income, gain, loss, deductions, or credits of the partnership, as determined for Federal income tax purposes, were *519 to be allocated entirely among the limited partners. On November 1, 1973, the partnership agreement was amended a second time in order to admit additional limited partners for the purpose of acquiring partnership capital.This second amendment increased the measure of capital from $2,500 units to $5,000 units. By acquisition agreement dated October 4, 1973, Cinegroup sold to Cinesai, subject to the outstanding distribution agreements, all rights to "Hurry Up" in the United States, its territories, mandates. The stated price for those rights was $600,000, of which $125,000 was to be paid in cash or by check at the closing, and the balance of $475,000 was to be paid by a negotiable promissory note, bearing interest at the rate of 6 percent.The note was to be paid interest-first out of 80 percent of the proceeds from distribution. This acquisition agreement did not specify the closing date. At the closing: (a) Cinesai was to pay Cinegroup $15,000 to reimburse Cinegroup for legal, accounting, or other expenses; (b) Cinegroup was to deliver to Cinesai various instruments necessary to effect the transactions, including a consent from AVCO; and (c) Cinesai and Cinegroup were *520 to enter into an agreement whereby Cinegroup would sell 25 percent of its musical rights in the film for $10,000 payable in cash or by check at the closing. Cinesai executed the contemplated note, wherein the stated maturity date was October 4, 1983. The note was accompanied by a security agreement which reflected the 80 percent payment provisions of the acquisition agreement and stated that the film rights served as collateral. This note was cancelled on December 7, 1973. By agreement of assignment also dated October 4, 1973, Cinesai assigned to Cinefai the rights Cinesai had acquired under the acquisition agreement with Cinegroup. The price to be paid by Cinefai under this agreement exceeded that to be paid by Cinesai under the acquisition agreement, in that the cash to be paid by Cinefai was increased from the $125,000 to be paid by Cinesai, to $135,000. By separate agreement of assignment, the music rights were assigned to Cinefai by Cinesai for the independent consideration of $10,000. By amended acquisition agreement dated November 1, 1973, Cinegroup sold to Cinesai (subject to the provisions of the distribution agreements with AVCO, Phoenix, and Cinema Arte) all *521 worldwide film rights in "Hurry Up." The stated price was $1,200,000, of which $189,362 was to be paid in cash or by check and $1,010,638 was to be a negotiable promissory note to be delivered on the date of closing.A note as contemplated, bearing interest at the rate of six percent was executed by Cinesai in favor of Cinegroup. The film rights in "Hurry Up" served as the stated collateral for the note. Cinesai agreed to prepay interest in the amount of $58,500; and thereafter, the note provided that Cinegroup was to be paid interest-first from 60 percent of the proceeds of the film until the sooner of satisfaction of the note or November 1, 1983. By amended agreement dated November 1, 1973, Cinegroup sold to Cinesai a 50 percent interest in the musical score for $10,000. By agreement of assignment dated November 1, 1973, Cinesai assigned all of its rights in "Hurry Up" to Cinefai for the stated price of $1,200,000, payable in cash or by check in the amount of $189,632 and by taking subject to the promissory note of $1,010,638. Cinefai expressly did not assume the liability under the note but took subject to the liability, and the parties have stipulated that "hence, the note *522 was rendered nonrecourse." Also by agreement dated November 1, 1973, Cinesai assigned its 50 percent interest in the worldwide musical score in "Hurry Up" to Cinefai for $10,000. The closing of the acquisition transaction occurred no earlier than December 7, 1973. During the Fall of 1973, Cinefai sold 60 limited partnership units at $5,000 each, including two units to Bizub, five units to Slack, and three units to Alabama Land and Timber, on or about October 4, and September 30, respectively. Slack received a B.A. degree in business management from the University of Florida and he also has some background with the New York Institute of Finance. At one point, he was a stockbroker with the investment house of Thompson McKinnon. Later, he bought a seat on the Chicago Mercantile Exchange and was a floor trader there for approximately one year.He has always been the sole shareholder of Georgia-Carolina Land Company, the parent of Alabama Land and Timber. He has at varying times been president of these two corporations, among others. He has never had any experience in the production or distribution of motion pictures, and he has never seen "Hurry Up." Bizub is in the construction *523 business, and he likewise has never had any experience in the production or distribution of motion pictures. A schedule was used in the sale of partnership interests in Cinefai which projected a yield of $15,600 from tax savings on a $10,000 cash investment -- that is, a 56 percent tax profit. The schedule is as follows: Tax
Tax Saving
Year
Investment
Deduction
Credit
50% Rate
1973
$10,000.00
$16,700.00
$2,800.00
$11,150.00
1974
5,600.00
2,800.00
1975
3,300.00
1,650.00
$10,000.00
$25,600.00
$2,800.00
$15,600.00
"Hurry Up" is a feature-length color sound motion picture in the English language. It contains original music composed, arranged, and conducted by Stephen Lawrence. The leading roles were played by John Lefkowetz and Linda DeCoff. It is a slice-of-life comedy, in the genre of "Marty," about a young man who lives in Brooklyn and who is just turning 30. He works in his father's print shop, has a girl friend, but is unhappy with his life. He meets and falls in love with a sophisticated young Manhattan actress and is introduced to a whole new world. Ultimately, he is hurt emotionally, but returns to his former *524 lifestyle -- hopefully a bit wiser. "Hurry Up" was filmed on location in the New York City area. It had a Code Rating of "R." "Hurry Up" opened in two theaters in New York City (The 34th Street, East and The 86th Street, East) on November 14, 1973. The results were as follows: Start of
Engagement
Film
Theater
Play Date
Rentals
Totals
34th Street, East
11/14/73
$3,325.50
11/21/73
1,688.50
11/28/73
127.35
$5,141.35
86th Street, East
11/14/73
$4,417.94
11/21/73
2,664.46
11/28/73
340.97
$7,423.37
$12,564.72
The film played an additional two weeks at The 34th Street, East Theater, but it did not cover house expenses for the last two weeks. Consequently, it did not earn any film rentals during that two-week period.
"Hurry Up" was in the bottom half of the Variety Top 50 list for the first two weeks of the New York City run.
The film drew favorable reviews from Judith Crist in the New York Magazine, Howard Thompson in the New York Times, Francis Herridge in the New York Post, Judith Rapp in Parents Magazine, Bruce Williams in Playboy, Martin Mitchell in After Dark, Gene Shalet on NBC *525 television, Kevin Sanders on ABC-TV, and by John Crittenden in the Bergen Record. The film drew an unfavorable review in the New York Daily News.
Following the New York City engagements in November and December 1973, "Hurry Up" had no more play dates until February 1974 when it played in Atlanta. During the following months of March and April, the film was shown at two theaters in Dallas, Texas, and at two theaters in Miami, Florida. Also in the Spring of 1974, a contract was entered into with the United States Navy. The results of distribution through the Spring of 1974 were as follows: Gross Receipts (Billings)
N.Y. City opening engagement
$12,565.00
Atlanta engagement
2,396.00
Dallas engagement
630.00
$15,591.00
Miami engagement
1,702.00
Navy
21,880.00
$23,582.00
Total Gross Receipts
$39,173.00
Cinefai Associates Share
50% of New York, Atlanta,
and Dallas gross receipts
$ 7,796.00
25% of Miami and Navy gross
receipts
5,896.00
Total Share Due
$13,692.00
Less: Expenses to be borne by
Cinefai
11,879.57
Balance Due
$ 1,812.43
In March 1974, "Hurry Up" appeared at the USA Film Festival in Dallas, *526 Texas, and was presented with a certificate by the host critic, Judith Crist, as one of the best American citizen-directed films of the year. Following April 1, 1974, AVCO did not actively distribute "Hurry Up" with the exception of one playdate during the summer of 1974 in Monticello, New York. By August 31, 1974, Cinefai had earned and received as a result of the distribution of the film, $13,745. That amount represents the only proceeds from distribution that Cinefai received during the years here involved. By September 1974, Jacoby (the producer and director of the film) and Bridges (president of FAI, the general partner of Cinefia) had become disappointed with AVCO's indifference toward the marketing campaign which directly related to the film's prior box office results -- there having been no activity during the months of June, July, and August. By the end of the year 1974, due to AVCO's refusal to market the film properly, parties representing Cinefai contacted AVCO with the aim of reclaiming the United States distribution rights held by AVCO. Protracted negotiations ensued, including a threat by Cinefai to sue, which culminated in an agreement between AVCO and *527 Cinefai, pursuant to which Cinefai received from AVCO all physical materials relating to the distribution of the film. The original distribution agreement and all amendments thereto were terminated. Cinefai paid AVCO $10,000 simultaneously with the execution of the agreement. In addition, AVCO was to receive ten percent of the gross receipts received by Cinefai until AVCO had received $57,000. In January 1975, during the time negotiations were in progress between Cinefai and AVCO which culminated in the May 1975 buy-back, Robert Kilgore, the sales manager for S. & H. Entertainment, Inc. (hereinafter, "S&H"), a motion picture distributor, screened "Hurry Up" and was favorably impressed by it. With the termination of the AVCO distribution agreement, Cinefai and S&H entered a distribution agreement on July 1, 1975. S&H put together a new advertising campaign in an effort to market the picture more successfully. By the spring of 1976, S&H was in financial straits and it became apparent to Bridges that another distributor would have to be sought. Bridges had by this time engaged in several other motion picture ventures and had come to the view that distribution was the Achilles *528 heel in the motion picture business. Accordingly, in an effort to assure better distribution, he formed a corporation and purchased the stock of S&H in May 1976 for $60,000, which had been raised by Bridges for that purpose. Bridges relied on Kilgore, his sales manager, to promote and distribute the film. Kilgore had been in the film industry for over 30 years. His experience included managing movie theaters, selling films, owning a movie theater, and distributing films. Kilgore developed a new promotional campaign after several weeks of research, designed to attract the public in the 17 to 25-year old group. S&H spent approximately $100,000 on the promotion of the film. Unfortunately, S&H's distribution efforts proved to be no more successful than AVCO's. In August 1978, Cinefai entered into an agreement with Ben Barry and Associates for the television syndication of the film. In the following month of September 1978, Cinefai assigned to Technicolor, Inc. the first $30,932.92 to be received from television syndication in order to satisfy a debt with Technicolor. Ben Barry and Associates was subsequently acquired in 1979 by Gold Key Entertainment, which is wholly owned *529 by Technicolor, Inc. In a report cumulative to April 26, 1980, Gold Key reported gross receipts of $500, with a negative balance due the producer of $6,670.66. That report reflected pending contracts totalling approximately $129,653. As of October 25, 1980, Gold Key reported gross receipts from television syndication of the film and pending contracts of $145,988.98. The film was still being distributed domestically during 1980. The last playdate of the film in the United States was April 4, 1980. With respect to the foreign distribution of the film, Transcontinental Pictures International ("Transcontinental") succeeded Inter-Ocean as the foreign distributor. Transcontinental was owned and managed by Israel Shaked. In 1981 Shaked sold the film to a private distributor in the United Kingdom and to the Indian government. The United Kingdom contract was for $5,000 plus a $5 royalty for each cassette sold, and the contract with the Indian government was for the use of the film for five years for $4,500 less expenses. Of this amount, Cinefai received $2,712.50. As of the time of trial the marketing efforts in behalf of the film were aimed at foreign markets and television *530 syndication. On its 1973 Federal partnership return, Cinefai reported deductions of $597,740 for depreciation, $62,920 for prepaid interest, $21,586 for legal and accounting, $400 for advertising, and $16 for miscellaneous expenses. Cinefai also reported the film as new investment property, with a cost basis of $1,200,000, which qualified for the investment credit. On their 1973 return, petitioner Bizub took a $2,823 investment credit based on a $40,329 share of the film's cost, petitioner Slack took a $7,236.10 investment credit based on a $103,372.81 share of the film's cost, and petitioner Alabama Land and Timber, Inc. took a $4,200 investment credit based on a $60,000 share of the film's cost. On its 1974 Federal partnership return, Cinefai reported deductions of $172,425 for depreciation, $1,600 for legal and accounting, $15,000 for consulting, $11,880 for distribution, $250 for film promotion, $200 for travel and $485 for miscellaneous expenses. On its 1975 Federal partnership return, Cinefai reported deductions of $123,595 for depreciation, $17,038 for distribution and $3,260 for miscellaneous expenses. On its 1976 Federal partnership return, Cinefai reported deductions *531 of $126,240 for depreciation, $1,729 for advertising, $500 for administrative expenses, $500 for film promotion, $88 for screening, $119 for supplies and $260 for video. In his notice of deficiency, respondent disallowed all the above-mentioned deductions and credits. OPINION At the outset we must decide when Cinefai acquired title to the film from Cinesai. Petitioners contend that this occurred on October 1, 1973, or at the latest, November 1, 1973. Respondent argues that the acquisition of an interest in the film by Cinefai occurred no earlier than December 7, 1973. The transactions surrounding this controversy can be summarized as follows: In an Acquisition Agreement entered into on October 4, 1973, Cinegroup sold to Cinesai all of its title and interest in the film in the United States subject to a Distribution Agreement between Cinegroup and AVCO Embassy Pictures Corporation. Cinegroup and Cinesai entered into an Amended Acquisition Agreement made as of November 1, 1973, expanding Cinesai's title and interest in the film to include the entire world, subject to certain distribution agreements respecting Canada and Central and South America. The Agreement provided that *532 Cinesai was to pay Cinegroup $189,362 as a down payment toward the purchase price of $1,200,000. The Agreement also stated that Cinesai had "on or before November 1, 1973," paid Cinegroup $150,000, which was credited towards the down payment. On October 4, 1973, Cinefai executed an agreement with Cinesai in which all of Cinesai's right, title and interest to the picture were transferred to Cinefai. In a second Agreement of Assignment made as of November 1, 1973, Cinesai assigned to Cinefai all of its rights, title and interest in and to the film subject to distribution agreements. According to the second Assignment, the purchase price was $1,200,000, "$189,362 in cash, receipt of which is hereby acknowledged." In a letter dated December 7, 1973, Cinegroup and Cinefai executed an Escrow Letter Agreement. This Agreement outlined the collection and disbursement of funds between each group. Respondent, in his brief, contends that the Amended Acquisition Agreement and the second Agreement of Assignment, both dated November 1, 1973, could not have been viewed by the parties as binding on that day for three reasons: First, the Amended Agreement dealt with the transfer of worldwise *533 rights, and Lefron Associates, the entity which was to receive the foreign rights in the picture, was not formed until November 1, 1973. Second, the acquisition of the film was funded by the sale of limited partnership interests, all of which were subject to cancellation until the last partnership interest was sold. The last partnership interest was not sold until at least December 13, 1973. Finally, the Escrow Letter Agreement, which provided for the payment of funds at closing, is dated December 7, 1973.
A sale consists of the passing of title from the seller to the buyer for a price. The primary principle in the interpretation of any contract for sale is the intention of the parties. United States v. Moorman,338 U.S. 457 (1950). The record establishes to our satisfaction that the parties intended title to pass to the film when each respective agreement was executed. Respondent's arguments concerning the formation of Lefron Associates and the sale of limited partnership interests do not detract from our belief. With respect to the December 7 Escrow Agreement Letter, *534 we believe this pertained to the distribution of funds amongst the parties. Petitioners contend that title passed on October 4, 1973, or at the latest, November 1, 1973. We agree with petitioners. For purposes of this case, whether Cinefai acquired title in October or November is not material; therefore, for simplicity we will threat November 1, 1973 as the acquisition date. The first issue for decision concerns whether the nonrecourse debt in the amount of $1,010,638 is properly includable in the basis of the movie purchased by Cinefai. The resolution of this issue has a bearing on the amount of the depreciation deductions, if any, and on the deductibility of the prepaid interest. It is generally accepted that where property is acquired by purchase its cost includes the amount of liabilities assumed, or taken subject to, by the purchaser. Crane v. Commissioner,331 U.S. 1 (1947). The mere fact that the liability is secured only by the asset transferred, and that the purchaser otherwise has no personal liability (i.e., a nonrecourse note) will not alone prevent *535 such liability from being included in the basis of property. Mayerson v. Commissioner,47 T.C. 340 (1966). However, where the purchase price and the principal amount of the nonrecourse note unreasonably exceeds the fair market value of the property securing the note, the face amount of the note will not be included in the depreciable basis of the property. [6]Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Odend'hal, Jr. v. Commissioner,80 T.C. 588 (1983). *536 In the case at bar, respondent contends that petitioners are not entitled to their share of Cinefai's depreciation deductions which are attributable to the nonrecourse note. Thus, to rebut respondent's contention, petitioners must prove that the film's fair market value reasonably approximated its purchase price. Based on all the evidence presented, we do not believe petitioners have satisfied their burden of proof. Several factors lead us to this conclusion. First, respondent presented four expert witnesses, each of whom valued the film between $20,000 and $42,000. One of the witnesses, Mr. D. J. Edele, was very familiar with the film in his capacity of Vice-President and General Sales Manager of AVCO at the time Conefai purchased the film in November, 1973. Mr. Edele, who testified he would pay $25,000 for all rights to the film as of November 1, 1973, was in charge of the distribution of the film. Although we do not view respondent's witnesses' estimates of the film's value as necessarily conclusive, we do believe it significant that all four estimates were no where near the $1,200,000 purchase price. See Brannen v. Commissioner,78 T.C. 471 (1982). *537 Also, Cinefai reported on its 1973 partnership return that it expected to derive total income from the film over its useful life of $12,000.We doubt that a film worth $1,200,000 in November would decline in value $1,188,000 just 60 days later. Thus, we find it inconceivable that Cinefai would pay $1,200,000 for a film which they believed was going to provide them with just $12,000 of income. Brannen v. Commissioner,supra.
A related factor is the November 1 Assignment between Cinesai and Cinefai in which Cinefai agreed to repay the note from receipts that it received from the film. Since Cinefai's gross receipts were the only source of payment on the note, as well as the source of profit, a reasonable projection of such receipts as of November 1 would be highly relevant in determining both the fair market value of the movie and whether any part of the principal of the nonrecourse note would ever be paid. If Cinefai estimated as of the end of 1973 that $12,000 was the gross income that it anticipated it would receive from the film over the film's useful life, Cinefai could hardly have expected to repay a $1,010,638 note plus interest. No payments of principal *538 were ever made; and the only "interest" paid was the $58,500 prepaid at acquisition.
The third factor that undercuts $1,200,000 as a legitimate purchase price is the cost of producing the film, which was approximately $150,000. Of course, if the film's March 1973 opening in Boston had been successful, the relevance of the film's production costs would be less significant when Cinefai purchased it in November 1973. However, viewing the facts in a light most favorable to petitioners, the results of the Boston opening were merely "inconclusive." Thus, using the production cost as a measure of value, there was no reason to pay $1,200,000 for a film costing $150,000, which had, at best, an inconclusive track record. The cash portion, $189,362, of the purchase price paid by Cinefai for the film supports this conclusion. See Siegel v. Commissioner,78 T.C. 659 (1982).It is this cash outlay which appears to more closely approximate the actual fair market value of the film. In sum, we conclude that the fair market value of the film did not remotely approach the total purchase price of $1,200,000. Accordingly, the note shall not be considered as part of Cinefai's investment *539 in the film. Therefore, the note is not includable in the depreciable basis of the film, nor are petitioners entitled to a deduction for their share of the $58,500 for prepaid interest. That amount is to be treated as an additional payment of principal for the film. Siegel v. Commissioner,supra, at 687. [7]
The next issue for decision is whether Cinefai entered into the transaction with the objective and intent of making a profit. *540 Petitioners must establish that Cinefai purchased the film with the requisite of profit objective. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without published opinion     F.2d     (D.C. Cir. April 14, 1983); Wildman v. Commissioner,78 T.C. 943 (1982); Siegel v. Commissioner,supra;Brannen v. Commissioner,supra.In determining whether the partnership engaged in the activity for profit, all relevant facts and circumstances must be taken into account. Wildman v. Commissioner,supra.
In prior similar cases, this Court has considered the relevant factors listed in section 1.183-2(b), Income Tax Regs. See Wildman v. Commissioner,supra;Siegel v. Commissioner,supra;Brannen v. Commissioner,supra. Applying these factors to the instant case, we believe the partnership purchased the film with an actual and honest objective of making a profit. At all times the partnership was operated *541 in a business-like and professional manner. The partnership maintained thorough records, and Mr. Bridges regularly corresponded with the limited partners on partnership matters. See section 1.183-2(b)(1), Income Tax Regs.
Although Mr. Bridges did not have a great deal of experience in the motion picture industry in 1973, the individuals that he primarily relied on were professionals in that field. Section 1.183-2(b)(2). Also, when the partnership purchased the film, it knew it was being distributed by AVCO, a reputable and successful company engaged in the distribution of motion pictures. Moreover, when the partnership and Mr. Jacoby became dissatisfied with AVCO's distribution efforts, Mr. Bridges actively negotiated with AVCO to acquire the distribution rights to the film from AVCO. Ultimately, Mr. Bridges raised an additional $60,000 to purchase S&H, a distribution company, so that the partnership could control the distribution of the film. S&H spent approximately $100,000 to market the film, and Mr. Bridges has continued his efforts to promote the film. Section 1.183-2(b)(3), Income Tax Regs.
Other factors that convince *542 us that the partnership had a profit objective are that Mr. Bridges was aware when he purchased "Hurry Up" that the film was favorably viewed by a leading critic, Judith Crist, and that the film was scheduled to open in New York in two separate theaters in November, 1973. At that time, these factors indicated that the film was off to a good start. Also, there were no elements of personal pleasure or recreation often involved with activities not engaged in for profit. See section 1.183-2(b)(9), Income Tax Regs.
Respondent places a great deal of significance on the film's initial showing in Boston in March 1973, eight months prior to the partnership's purchase. Admittedly, the film played for three weeks and its box office gross failed to cover the theater's expenses. However, we are not persuaded that this fact establishes that the film was not purchased by the partnership with a profit objective. Indeed, one of respondent's witnesses testified that on the basis of the Boston showing he could not predict whether or not the film would make a profit. Finally, respondent points to the inflated $1,200,000 purchase price as an indication that the partnership *543 did not have a profit objective. However, in this case, the partnership's profit is not to be measured against the $1,010,638 nonrecourse note, but against the partnership's cash outlay. After Cinefai recovered its cash outlay, it was entitled to a 40 percent share of net rentals. This is profit. See Wildman v. Commissioner,supra, at 954. In sum, the motion picture industry is a highly speculative business. Only a small percentage of the pictures produced ever make a profit. However, this does not necessarily imply that a film's purchase is not an activity engaged in for profit. Although tax motives played a significant role in the purchase of "Hurry Up," on balance, we find Cinefai acquired the film with a profit objective. See and compare Wildman v. Commissioner,supra;Siegel v. Commissioner,supra; and Brannen v. Commissioner,supra.
The next issue for decision is whether petitioners are entitled to an investment tax credit with respect to the partnership's purchase of the film. On its partnership return for the year 1973, Cinefai reported that the film was new property with a useful *544 life of seven years of more, and thus claimed the full seven percent investment tax credit. Respondent disallowed petitioners' investment credit for three alternative reasons: (1) the film was not acquired with the primary motive of making a profit; (2) the film was not "new" section 38 property when acquired by the partnership; and (3) the film was used predominantly outside the United States.Since we have already held that Cinefai purchased the film with an objective of making a profit, we will first address respondent's second argument. Initially, we note that petitioners acquired the film on November 1, 1973, not on December 7, 1973, as asserted by respondent.
Under section 48(k) and section 1.48-8(a)(1), Income Tax Regs., an investment credit is allowed on a new film in the year in which it is placed in service. Section 4.48-8(a)(5) defines "placed in service:" A qualified film is placed in service when it is first exhibited or otherwise utilized before the primary audience for which the qualified film was created. Thus, a qualified film is placed in *545 service when it is first publicly exhibited for entertainment purposes * * * A qualified film is not placed in service merely because it is completed and therefore in a condition or state of readiness and availability for exhibition, or merely because it is exhibited to prospective exhibitors, sponsors, or purchasers, or is shown in a "sneak preview" before a select audience. In Siegel v. Commissioner,supra, this Court held that section 48(k) applies to films placed in service before January 1, 1975. Petitioners argue, however, that the film had not been placed in service when they purchased it on November 1, 1973. The resolution of this issue turns on whether "Hurry Up" was placed in service when it was shown in Boston during three weeks in March 1973. Petitioners contend that the film was not exhibited in Boston for "entertainment purposes," but rather was shown to a "select audience" to determine whether the promotional campaign was appropriate. Petitioners rely heavily on the testimony of Messrs. Jacoby and Bridges, both of whom stated that the Boston showing was a "test run." We are not persuaded by petitioners' characterization of the Boston run. *546 The Boston Globe and Variety both referred to "Hurry Up's" opening in Boston as the world premiere. Also, Mr. D. J. Edele, the vice president and general sales manager of AVCO at the time the film was shown in Boston, testified that the film "premiered" in Boston to take advantage of the large number of college age people in the city who Mr. Jacoby and AVCO believed would be most interested in the film. Perhaps most importantly, the film played for three weeks before the paying public, and would have continued to play if its showing had been more successful. This demonstrates to our satisfaction that the film was "publicly exhibited for entertainment purposes." The film was not shown merely to prospective exhibitors, sponsors, purchasers or before a select audience. Accordingly, because the film was not new property when acquired by Cinefai on November 1, 1973, petitioners are not entitled to an investment tax credit. Since we agree with respondent's second argument, we need not address whether the film was used predominantly outside the United States. The next issue for decision concerns whether petitioners are entitled to a deduction for the years in issue under *547 the income-forecast method of depreciation. Respondent argues that with the exception of 1974 when Cinefai did receive income, petitioners' depreciation deduction should be zero because Cinefai did not report any income in 1973, 1975, or 1976. Petitioners do not dispute that Cinefai did not receive any income in 1973, 1975 or 1976, but argue that Cinefai's gross income should include that reported by the distributor. Alternatively, petitioners contend that Cinefai should be entitled to depreciate the film on a straight line basis, or be allowed to depreciate the entire cost of the film in 1974.
Section 167(a) provides that a taxpayer shall be allowed, as a depreciation deduction, a reasonable allowance for the exhaustion of property used in a trade or business. With respect to a film, respondent has concluded that the general methods of depreciation prescribed in section 167(a) are inadequate because a film will typically produce an uneven flow of income, and a film's usefulness is realistically measured by the income it produces and cannot adequately be measured by the passage of time *548 alone. Rev. Rul. 60-358, 1960-2 C.B. 68; Rev. Rul. 64-273, 1964-2 C.B. 62. Therefore, respondent devised the "income forecast" method of depreciation. This methodinvolves the use of a fraction, the numerator of which is the income from the film for the taxable year, and the denominator of which is the estimated total income to be derived from the film during its useful life. This fraction is multiplied by the cost of the film to arrive at an annual depreciation figure. In several previous cases, this Court has held that partnership income does not include income received by the distributor. Wildman v. Commissioner,supra;Siegel v. Commissioner,supra. It is undisputed that Cinefai, a cash basis taxpayer, received no payments in 1973, 1975 or 1976 for the exploitation of the film. Therefore, the partnership is not allowed any depreciation deduction for those years, and petitioners' distributive share of such deduction is zero. Petitioners also argue for the first time on brief that they are entitled to depreciate the film under the straight line method. Section 167(b)(1). In Wildman,supra, at pages 952-953, *549 under virtually identical facts, the taxpayers made a similar argument. This Court held that section 446(e) precluded the taxpayers from choosing an alternative method of depreciation without the consent of respondent. In the instant case, no such consent was given by respondent. Inasmuch as Wildman is indistinguishable from the instant case, we believe it is dispositive of petitioners' argument.
With respect to 1974, it is uncontroverted that Cinefai did receive $13,745 for exploitation of the film in that year. Since the partnership did receive income, petitioners urge in their reply brief (their original contention having been undercut by the Siegel and Wildman cases) that they should be entitled to deduct the entire cost of the film as depreciation in that year. In our opinion that would effect a clear and gross distortion of partnership income and it cannot be allowed. If the income forecast method is applied for 1974, the evidence fails to establish a critical element for the utilization of that method, that is, the determination of the denominator of the fraction, the estimated total income to be derived from the film during its useful life. On the partnership's *550 1974 return, a denominator of $54,600 was used. Petitioners did not present any evidence to convince us that $54,600 was a reasonable estimate of the film's potential income. On the contrary, much of petitioners' case centered on the absence of a reliable method to compute a film's gross income because of the spectulative character of the industry. Due to the lack of evidence presented by petitioners on this issue, we must conclude that Cinefai's denominator for purposes of computing depreciation for the year 1974 is zero. Accordingly, petitioners are not entitled to a depreciation deduction in 1974, based upon use of the income forecast method. The final issue for decision concerns petitioners' share of miscellaneous expenses deducted by Cinefai during the years in issue. Respondent disallowed Cinefai a deduction of $21,586 for legal and accounting fees in 1973, and a deduction of $15,000 for commissions and consulting fees in 1974, because these amounts constituted nondeductible capital expenses. Respondent also disallowed Cinefai deductions in 1974 and 1975 for distribution expenses in the amount of $11,880 and $17,038, respectively, because petitioners did not establish *551 that these amounts were ordinary and necessary business expenses. Petitioners have the burden of proof on these issues. Welch v. Helvering,290 U.S. 111, (1933). Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners did not present any evidence on these issues at trial, nor have they raised them in their briefs. Accordingly, because petitioners failed to sustain their burden of proof, we hold for respondent on these issues. Cinefai deducted several other expenses during the years in issue.These deductions are the following: 1973
1974
1975
1976
Advertising
$400
$1,729
Film Promotion
250
500
Travel
200
Administration
500
Printing
1,400
Screening
88
Supplies
119
Video
260
Miscellaneous
16
485
3,260
Legal & Accounting
1,600
Total
$416
$2,535
$3,260
$4,596
Respondent disallowed these deductions on the ground that Cinefai did not enter the transaction with the objective of making a profit. Since we have already held that Cinefai did have the requisite profit objective, we hold for petitioners as to the deductibility of the above-listed amounts. *552 Appropriate orders will be entered in these cases restoring them to the general docket for further proceedings in due course. Effect will be given to the disposition of the severed issues hereinabove at the appropriate time in those further proceedings. Appropriate orders will be entered.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Arthur R. Slack, Docket No. 3958-80; and Georgia-Carolina Land Company, Inc., and its subsidiary, Alabama Land and Timber, Inc., Docket No. 3959-80.↩
2. The severed issue relating to the Mulberry Company was dealt with in Broyles v. Commissioner,T.C. Memo. 1982-482↩. Petitioner Slack conceded the Mulberry issue in that case. Effect will be given to that concession in the decision ultimately entered in his case at Docket No. 3958-80.
3. AVCO was a well-known motion picture distributor, headed by Joseph E. Levine.It was described by one witness as a "mini-major," to distinguish it from major distributors such as Twentieth Century-Fox and United Artists. AVCO had been the distributor for such highly successful pictures as "The Graduate."↩
4. On June 13, 1973, the date of the Inter-Ocean/Cinema Arte agreement, world-wide distribution rights (except as to Canada) were held by AVCO. It appears that AVCO was aware of the Inter-Ocean/Cinema Arte transaction, and made no objection thereto.↩
5. See footnote 3, supra.↩
6. As we noted in Odend'hal v. Commissioner,80 T.C. 588, 604 n. 7: We note that in Brannen v. Commissioner,78 T.C. 471 (1982), on appeal (11th Cir., August 23, 1982), we stated that the test was whether the stated purchase price unreasonably exceeds the value of the property, 78 T.C. at 493, whereas in Hagar v. Commissioner,76 T.C. 756, 773 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeds the value of the property. We do not decide which test is appropriate on the facts before us (see Brannen v. Commissioner,supra,↩ at 513 (Chabot, J., concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the property.
7. Our opinion is unaffected by the recent United States Supreme Court opinion in Commissioner v. Tufts,461 U.S.    , 51↩ U.S.L.W. 4518 (May 2, 1983), which held that where a taxpayer disposes of property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the obligation in the amount realized. The Supreme Court, relying upon the Commissioner's treatment and over 35 years of judicial sanction, held that the debt should be treated as a true loan. Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness which was not the fact in Tufts.