RICHARD L. BELTZHOOVER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beltzhoover v. Commissioner
Docket No. 47633-86
United States Tax Court
T.C. Memo 1991-493; 1991 Tax Ct. Memo LEXIS 542; 62 T.C.M. (CCH) 905; T.C.M. (RIA) 91493; September 30, 1991, Filed *542 Decision will be entered for the respondent. Christine Crull Altman and Anne Poindexter, for the petitioner. Andrew Winkler, for the respondent. PATE, Special Trial Judge. PATE
MEMORANDUM FINDS OF FACT AND OPINION This case was assigned pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioner's 1977 and 1978 Federal income taxes in the amounts of $ 8,053 and $ 3,600, respectively. Respondent also found that petitioner was subject to additions to tax for negligence under section 6653(a), and an increased interest rate under section 6621(c) (formerly section 6621(d) for both years. The issues for our decision are: (1) Whether petitioner may deduct partnership losses and claim investment credits as a limited partner in Tristar, Ltd.; (2) whether *543 petitioner is liable for additions to tax for negligence under section 6653(a); and (3) whether petitioner is liable for an increased rate of interest on deficiencies under section 6621(c). In 1977, petitioner invested in a limited partnership, Tristar, Ltd. (hereinafter Tristar), which was formed to participate in a program, offered by the Nitrol Corporation and a management corporation, Transit Management Company (hereinafter TMC), known as the Nitrol Program. Petitioner deducted losses and claimed investment tax credits derived from that partnership interest in both 1977 and 1978. We previously considered the tax effects of the Nitrol Program in Sutton v. Commissioner, 84 T.C. 210 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986), affd. sub nom. Knowlton v. Commissioner, 791 F.2d 1506 (11th Cir. 1986). In that case, we held that the transactions involved in the Nitrol Program were entered into without a profit objective because: (1) The taxpayers would not have agreed to pay the high price they actually paid for their Nitrol trailers if they had been concerned about the profitability of their operations; (2) the taxpayers did not rely on independently prepared *544 profit projections, but instead relied exclusively on the promoter's representations in evaluating profitability; (3) the taxpayers did not monitor the amount of revenue produced by their Nitrol trailers during operations; and (4) the cash contributions taxpayers made in years subsequent to the purchase of the trailers were made to protect their previously claimed tax benefits. There were numerous taxpayers involved in the Sutton litigation. Some of the taxpayers purchased their Nitrol trailers as individuals and reported their claimed losses on Schedule C. One of the taxpayers, Jules Dressler, held a limited partnership interest in a partnership which purchased and operated a Nitrol trailer, and claimed losses and an investment credit flowing from the partnership's operations. In evaluating whether the loss deductions and the investment credit flowing from the partnership were allowable because they were produced by transactions entered into with a profit objective, we found that the intent of the partnership was controlling. Sutton v. Commissioner, supra at 221 n. 4. Petitioner, aware of our prior opinion in Sutton, seeks to distinguish himself from the taxpayers *545 in Sutton on the grounds that: (1) We should examine his objective rather than that of the partnership in determining whether the requisite objective of profit exists; and (2) in any event, both he and the partnership had an objective of profit. FINDINGS OF FACT Some of the facts have been stipulated. The Stipulation of Facts and exhibits attached thereto are incorporated herein by this reference. Richard L. Beltzhoover (hereinafter petitioner), resided in Carmel, Indiana, at the time he filed his petition. Petitioner's Role
Petitioner first learned of the Nitrol Program in 1977 from William J. Kelley (hereinafter Kelley). Kelley was a broker for Universal Heritage Investments Corporation (hereinafter Universal) and surveyed petitioner's financial condition with a view toward recommending investments for his retirement. Kelley had no experience in the trucking industry, but Universal promoted the Tristar offering and received 10 percent of the initial invested capital for doing so. Together with Kelley, petitioner reviewed the TMC and Nitrol brochures and the private placement memorandum. In deciding to purchase his Tristar interest, petitioner relied on Kelley's *546 recommendations without ascertaining his qualifications in either the investment or trucking industries. Moreover, petitioner, himself, did not conduct any independent investigation of the representations made in the private placement memorandum, or verify the existence of the Nitrol patent. Further, even though petitioner had previously used the services of a large and well-known accounting firm in Indiana, he failed to obtain their opinion of the Nitrol Program. The Nitrol Program
The Nitrol Program was centered around a patented process developed by David Dixon (hereinafter Dixon), a mechanical engineer. He designed the Nitrol unit, a controlled atmosphere system, which consisted of an insulated storage tank filled with liquid oxygen and nitrogen mounted on the chassis of a refrigerated highway freight trailer to be used for shipment of perishable products. The Nitrol unit produced a low-oxygen environment within the interior of the trailer which slowed the oxidation and deterioration of fresh fruits, vegetables, meat, fish, and fowl. It was anticipated that use of the Nitrol unit would result in delivering a fresher product to the buyer and in cost savings by eliminating *547 the need for precooling produce before shipment and by reducing the cost of refrigeration during transit. To exploit the Nitrol process, Dixon and three other individuals formed the Nitrol Corporation. The Nitrol Corporation acquired the right to use the Nitrol process from Dixon. After acquiring such process, the Nitrol Corporation purchased 100 refrigerated highway freight trailers for approximately $ 27,500 per trailer, financing them with the seller, Hobbs Corp., a division of Freuhauf Corporation (hereinafter Hobbs). Payments on the trailers were due in monthly installments and Hobbs retained a security interest in the trailers. The Nitrol Corporation then added a Nitrol unit to each trailer. It insured each of these units for $ 5,000. Tristar's Activities
In October of 1977, petitioner purchased, for $ 10,000, a 24.5-percent interest in Tristar, Ltd. (hereinafter Tristar), a limited partnership formed to acquire, own, and operate a Nitrol trailer. Pursuant to the private placement memorandum dated August 12, 1977, Tristar was to be capitalized at $ 40,000 by selling 40 limited partnership interests of $ 1,000 each. After selling all of the interests, Tristar *548 purchased, from Nitrol, one of the trailers that it had just purchased and outfitted with a Nitrol unit. Tristar "paid" a total price of $ 275,000, by making a $ 27,500 cash downpayment and executing a nonrecourse promissory note for the balance of $ 247,500. The note required the payment of interest only at the rate of 8 percent for the first year, and provided for amortization of principal and interest in equal monthly installments over the following 9 years. The Nitrol Corporation retained a security interest in Tristar's trailer. With regard to the purchase price of the trailer, the private placement memorandum represented that: The purchase price of the Trailer to be paid by the Partnership is substantially more than the price paid by Nitrol to the manufacturers of the Trailer and the refrigeration unit. The higher price paid to Nitrol represents compensation for Nitrol's installing the controlled atmosphere and refrigeration systems, which includes significant engineering and structural modifications to the Trailer, and reflects in part the cost of an exclusive license with respect to the patent covering the controlled atmosphere system, which requires substantial royalty *549 payments to be made by Nitrol. Because there is no other comparable piece of equipment to the Trailer and because it is unlikely that an independent appraisal of the value of the Trailer could be obtained, the price to be paid by the Partnership was determined by Nitrol and represents its estimate of the fair market value of the Trailer.
The Purchase and Security Agreement between Nitrol Corporation and Tristar contained the following warranty on the trailer: The seller hereby warrants to the buyer that the unit will, for so long as the buyer maintains such unit in accordance with the seller's specifications, perform in the manner described in the operating instructions delivered to the buyer at the time of sale of the unit for the purpose of maintaining the atmospheric conditions described therein. The foregoing warranty is in lieu of all other warranties, express or implied (including warranties of merchantability), and of all obligations or liabilities on the part of the seller for damages, including consequential and incidental damages arising out of or in connection with the use or performance of the unit, but excluding products liability damage against which the seller *550 agrees to indemnify and hold harmless the buyer.
Further, the Nitrol Corporation agreed: to make available first to the buyer and other purchasers of the Units and/or Improved Trailers any other products of the seller constituting improvements thereto resulting from patents derived from the technology which created the Units, without cost to the buyer.
The private placement memorandum represented that the $ 40,000 in capital that would be paid in by the limited partners would be disbursed as follows: Organizational Expenses
$ 2,500
Downspayment on Trailer
27,500
Management Agreement Expense
2,000
Working Capital
8,000
Total
$ 40,000
It also contained several financial projections. For instance, it projected that the trailer would produce revenues based on three coast-to-coast round trips per month of 5,600 miles each, or a total of 201,000 miles per year, producing a minimum of $ 180,000 in revenues each year. Starting July 1, 1977, these revenues were projected to produce positive cash flows during most years after taking into account the capital contribution of the partners in the initial year. It was projected that the partners' capital contribution *551 would be recovered by the end of 1985. The private placement memorandum also projected that for 1977 the limited partners would be entitled to deduct a $ 71,351 loss from operations and claim an investment tax credit of $ 27,500. Mr. Ed Glass (hereinafter Glass) was the general partner of Tristar. In accordance with the Nitrol program, Glass caused Tristar to enter into a trailer management agreement with TMC. TMC was a newly organized corporation but its officers had extensive experience in the management and operation of trailers. Under the provisions of the management agreement, TMC agreed to: (1) Solicit and negotiate motor freight contracts for the trailer; (2) monitor maintenance and performance of the trailer; (3) advise Tristar as to all applicable legal and regulatory requirements relating to the operation of the trailer; (4) negotiate settlement of all legal claims for loss of cargo or injury to persons or property in connection with operation of the trailer; and (5) furnish to Tristar quarterly reports of the income and expenses of the trailers. As compensation therefor, TMC was to be paid $ 2,000 upon the execution of the agreement and 3 percent of the gross revenue *552 produced from the operation of the trailer. In the middle of 1978, petitioner received a letter from Tristar informing him that the Nitrol Corporation had purchased TMC. In addition, Tristar asked him to contribute additional capital of $ 1,960, representing his pro rata share of a total request of $ 8,000. Petitioner received several letters from Tristar asking him for this additional contribution. In each letter he was promised that, if he made the additional contribution, it would result in the continuation of his tax benefits. For instance, one of them stated: -- Your tax benefits in 1978 will be increased. You will get your contribution as an interest deduction expense plus, you will get your pro-rata share of approximately $ 15,000 in depreciation not deducted in 1977 which can be claimed in 1978. Thus you should get about a 3-1 write-off, if you make your contribution. [Emphasis added.]
After all of the limited partners made their additional capital contribution, the cash was remitted to the Nitrol Corporation to bring its debt service to Hobbs current and to augment the working capital of TMC. Concurrent therewith, the Nitrol Corporation allowed Tristar *553 to amend its note, lowering its payments to interest only, of $ 1,650 per month, for 15 months commencing October 31, 1978. However, if the trailers did not generate enough cash, the amended note provided that the minimum monthly payment that would be acceptable for this period was $ 1,000 per month. Thereafter, interest and principal of $ 2,556.68 per month was payable for 36 months and the minimum acceptable payment was raised to $ 2,000 per month. Starting on January 1, 1983, Tristar agreed to pay 120 equal monthly installments of $ 2,556.68 per month and all remaining principal and interest outstanding was payable in full on December 31, 1992. In 1979, the Nitrol Corporation again became delinquent on its payments to Hobbs. Hobbs threatened foreclosure and notified Tristar thereof. In turn, Tristar notified its limited partners of the threatened foreclosure, but also informed them that the Nitrol Corporation was trying to refinance its outstanding debt. The Nitrol Corporation eventually refinanced the trailers with Budget Financial Corporation (hereinafter Budget), assigning to Budget its obligation with Hobbs and pledging the notes on the trailers as collateral on the *554 loan. In the fall of 1979, Tristar terminated the TMC management agreement and, in December, arranged for Altruk Freight Systems (Altruk) to take over. This agreement lasted until March of 1983, when Altruk terminated the contract. At that point, Tristar's accountant recommended that Tristar enter into a management agreement with FoodSource, Inc. (FoodSource). [2] The accountant indicated that Dixon was affiliated with FoodSource, had paid off the Budget Financial Corporation loan, and thereby had acquired the note and security interest on Tristar's trailer. The accountant further indicated that Tristar's obligations on the trailer, now apparently owed to Dixon, would be fulfilled by the revenue generated by FoodSource. Although it is not entirely clear, the record indicates that Tristar subsequently entered into a management agreement with FoodSource. However, Tristar never received an accounting from FoodSource with respect to the operation of its trailer. *555 On partnership income returns for the years 1977 through 1983, Tristar reported the following income, deductions, and losses: Year
Income
Deductions
Loss
1977
$ 40
$ 17,111
$ (17,071)
1978
20,018
103,753
(83,735)
1979
42,234
109,912
(67,678)
1980
4,199
41,792
(37,593)
1981
10,105
39,749
(29,644)
1982
10,994
36,198
(25,204)
1983
3,254
32,932
(29,678)
Total
$ 90,844
$ 381,447
$ (290,603)
Tristar filed a 1984 partnership return reporting that, except for depreciation, income and deduction information was not available. Tristar did not file a partnership return for 1985 or for any year thereafter. On his 1977 income tax return, petitioner claimed an investment tax credit of $ 6,739 attributable to Tristar's trailer. This amount represented a total investment credit of $ 27,500 ($ 275,000 x 10%) multiplied by petitioner's 24.5 percent interest in the partnership. On his 1977 and 1978 income tax returns, petitioner also deducted his share of Tristar's 1977 and 1978 partnership losses amounting to $ 4,672 and $ 7,288, respectively (after taking into account the at-risk limitations on those losses under section 465). In the notice of deficiency, *556 respondent disallowed all of the losses and the investment credit attributable to Tristar which were claimed by petitioner for 1977 and 1978. OPINION Petitioner attempts to distinguish his case from that of the taxpayers in Sutton, first, by maintaining that our determination of profit objective, for purposes of section 183, must be ascertained by an examination of his personal objective, not that of Tristar's. In this regard, petitioner claims that he had a bona fide and honest profit objective when he purchased his limited partnership interest in Tristar and, therefore, is entitled to his share of Tristar losses and investment credit.
This Court has held in a number of cases that, for purposes of section 183, whether an activity is entered into with a profit objective is to be determined at the partnership level. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Fox v. Commissioner, 80 T.C. 972, 1007 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa *557 v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5-7, 9 (3d Cir. 1984); Wildman v. Commissioner, 78 T.C. 943, 953-954 (1982); Siegel v. Commissioner, 78 T.C. 659, 698 (1982); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 784 (1981). Petitioner's purchase of his interest in Tristar and its operations in this case is indistinguishable from that of Jules Dressler, a petitioner in Sutton, who owned an interest in Overnite, Ltd., a limited partnership owning a Nitrol trailer. We found in Sutton that the deductibility of Dressler's losses had to be determined by looking at the partnership's objective. Sutton v. Commissioner, 84 T.C. at 212-213, 221 n. 4. We discussed the reasoning leading to these holdings at great length in Brannen v. Commissioner, 78 T.C. at 502-505 and, consequently, we need not repeat it here. Suffice it to say that we concluded in that case that: A partnership is an independently recognizable entity apart from its partners for the purposes of the calculation of its taxable income under *558 section 703. * * * A partnership level analysis is particularly relevant for a limited partnership because a limited partner has no control over the activities of the partnership and the deductions taken in the business conducted by the partnership. * * * [78 T.C. at 505.]
Nevertheless, petitioner argues that our position in Brannen v. Commissioner, supra, was based upon the Seventh Circuit's opinion in Madison Gas & Electric Company v. Commissioner, 633 F.2d 512 (7th Cir. 1980), affg. 72 T.C. 521, 564-565 (1979), and that that opinion addressed an entirely different issue, namely whether a partnership existed for Federal income tax purposes. Although the threshold issue in Madison Gas & Electric Company v. Commissioner, supra, was whether a partnership existed for Federal income tax purposes, once the Court decided that it did so exist, the ultimate issue it decided was whether certain expenses were "pre-operational costs of the partnership venture and therefore * * * were non-deductible capital expenditures." 633 F.2d at 517. With regard to this issue, the taxpayer argued that the court should examine the deductibility of the expenses taking into account *559 that each of the partners already was engaged in the same business as the business in which the partnership was about to embark, and that the partnership itself was an extension or an expansion of their existing business. The Seventh Circuit rejected the taxpayers' argument, holding that the characterization of the expenses had to be determined at the partnership level, and not by evaluating such expenses in light of the business already engaged in by the individual partners. This reasoning was followed in our decision in Brannen v. Commissioner, supra, where we held that the determination of profit objective under section 183 was to be ascertained at the partnership level and not by evaluating the objectives of the limited partners. Therefore, in order for us to allow petitioner's claimed losses and credits, we must find that Tristar had the requisite profit objective. This is necessary because, as a general rule, to deduct losses incurred in any activity, a taxpayer must show that he or she entered into the activity, or continued the activity, with an objective of making a profit. Sec. 1.183-2(a), Income Tax Regs. If the taxpayer engaged in the activity without such *560 profit objective, deductions attributable thereto are allowed, but (as applicable here) only to the extent of the income derived from the activity. Sec. 183(b)(1) and (2). The test under section 183 is whether the taxpayer engaged in the activity with an actual and honest objective of making a profit. Beck v. Commissioner, 85 T.C. 557, 569 (1985); Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Dreicer v. Commissioner, 78 T.C. 642, 644-646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all relevant facts and circumstances. Hulter v. Commissioner, 91 T.C. 371, 392-393 (1988); Golanty v. Commissioner, supra at 426. The burden of proving such objective is on petitioner. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Greater weight is given to objective facts than to a taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, 85 T.C. at 570; Thomas v. Commissioner, 84 *561 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). The regulations contain a nonexclusive list of factors to consider in determining whether an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used by the taxpayer may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling. Rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Benz v. Commissioner, 63 T.C. 375, 382 (1974). Using these factors, *562 in Sutton we analyzed the tax effects to a number of taxpayers, including one who held a limited partnership interest in a partnership participating in their Nitrol Program, and found that the Nitrol Program activities were not engaged in for profit within the meaning of section 183(a). We have compared the facts in that case with the record here and can find no materially distinguishing aspects between the two cases. Nevertheless, petitioner argues that Tristar had the requisite profit objective. In support thereof, he first maintains that the price of $ 275,000 paid by Tristar reflected the fair market value of the assets purchased which included: (1) The Nitrol unit, (2) a license to use and exploit the patented process, (3) warranty rights with respect to replacement of the Nitrol unit at nominal cost in the event of damage or failure, and (4) the right to any new technology with respect to the Nitrol process at no cost to Tristar. "Fair market value" has been defined as the price upon which a well-informed and willing buyer and seller would agree, dealing at arm's length, with neither acting under any compulsion to buy or sell. Drybrough v. Commissioner, 45 T.C. *563 424, 429 (1966), affd. 384 F.2d 715 (6th Cir. 1967). This definition assumes that the buyer and seller have adverse economic interests. Brannen v. Commissioner, 722 F.2d at 701; Narver v. Commissioner, 75 T.C. 53, 96 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Further, where the property to be valued has been sold in an arm's-length transaction, at or about the valuation date, the most reliable evidence of the fair market value of such property is its sales price. Chiu v. Commissioner, 84 T.C. 722 (1985). The Nitrol Corporation purchased the trailer sold to Tristar from Hobbs (an independent third party) at approximately the same time as it sold such trailer to Tristar. The Nitrol Corporation paid $ 27,500 for the trailer and added a Nitrol unit worth approximately $ 5,000. The trailer was then sold to Tristar for $ 275,000. Because sales between the Nitrol Corporation and other purchasers of the Nitrol program were part of a prearranged program, the parties to those sales were not dealing at arm's length and, therefore, we may properly ignore such sales for valuation purposes. On the other hand, the purchases of the trailer and the Nitrol unit by the Nitrol Corporation *564 were at arm's length and they reflect a total purchase price of approximately $ 32,500. Even if we should take into account a premium that could be commanded by the Nitrol Corporation because it controlled the Nitrol process, the total fair market value would not even approach the purchase price of $ 275,000 charged Tristar. Petitioner argues, however, that we must also take into account the fair market value of the intangible assets purchased by Tristar, namely a license to use and exploit the patented Nitrol process, the warranty rights for replacement of the Nitrol unit, and the right to any future technological improvements in the process. Petitioner argues that these intangible rights were extremely valuable and their value must be added to the value of the tangible asset (the trailer) when determining whether Tristar paid fair market value for its participation in the Nitrol Program. However, the documents evidencing Tristar's purchase show that Tristar paid $ 275,000 only for the Nitrol trailer. The private placement memorandum specifically states that "the trailer will be purchased from the Nitrol Corporation * * * for a price of $ 275,000 payable $ 27,500 in cash *565 and the remainder in the form of a promissory note." (Emphasis added.) Further, the private placement memorandum represented that Tristar would be entitled to an investment credit and depreciation deductions based on that $ 275,000 purchase price. Because investment tax credits are available only on the cost of tangible property (secs. 38(a)(2), 46(a) and (c), 48(a)), [3] and depreciation must be based on the cost of tangible property (sec. 168(a), (c)), [4] we conclude that the parties to the transaction contemplated that the entire purchase price was allocable to the Nitrol trailer. *566 Further, a reading of the private placement memorandum fails to show that any rights to the Nitrol patent were purchased by Tristar. The Nitrol Corporation's obligation to pay Dixon for the use of his patent did not transfer any of those rights to Tristar when it purchased its trailer. In addition, petitioner failed to prove that the warranty rights, and the rights to any technological advancements on the Nitrol process, had any substantial value. Most significantly, because Tristar did not pay anything for such rights, it is likely that the parties to the transaction believed that they did not have any value apart from the Nitrol trailer. Petitioner also argues that Tristar's profit objective is shown by the fact that the general partner had no relationship with the Nitrol Corporation or TMC and that TMC employed highly qualified officers to properly promote the trailers and to maximize the revenue they would produce. However, the private placement memorandum contains statements which cast doubt on this contention. Specifically, the conflict of interest section states that "The relationship between the Partnership and the General Partner has not been negotiated at arms-length," *567 that he "is or may in the future be the general partner of one or more other limited partnerships which will own and operate trailers which are virtually identical to the Trailer and which may compete with the Trailer for freight contracts and for tractors and drivers to operate the Trailer," and that "Accordingly, the General Partner may face situations in which his interests may be in conflict with those of the Partnership." Similarly, it was disclosed in the private placement memorandum that TMC would manage trailers for other owners. Although this fact does not in itself tend to show the lack of a profit objective, it must be considered together with the fact that TMC was organized by, and eventually taken over by, the Nitrol Corporation. Because Tristar had given the Nitrol Corporation a highly inflated promissory note, it is clear that all of the net revenues produced by TMC would be paid to the Nitrol Corporation. Therefore, the value of any expertise in TMC would accrue to the benefit of the Nitrol Corporation, and not to Tristar. Finally, petitioner argues that the private placement memorandum projected profits and cash flow, for both the partnership and the partners, *568 and these projections reflect Tristar's profit objective. However, we give little credence to these projections. They would have us believe that a trailer for which Tristar paid $ 275,000 was likely to produce a profit when competing against other trailers on the road that cost approximately one-tenth as much. In Sutton, we have already found that such was not the case, and there is nothing in this record that would change that conclusion. In summary, petitioner in this case, as did the taxpayers in Sutton, purchased an interest in a limited partnership. That partnership purchased a Nitrol trailer at a price so inflated that it precluded the possibility that profits would be produced for the limited partners. What that partnership interest did provide, however, was tax benefits in the form of an investment credit and losses flowing to petitioner from the partnership. These tax benefits were of such magnitude that they were more than ample to offset his cash outlay. In Sutton, we held that the partnership, Overnite, Ltd., did not engage in the Nitrol Program for profit and, accordingly, did not allow Jules Dressler, the limited partner, to deduct the losses and *569 obtain the investment credit attendant thereto. Because the facts we have found in this case closely track the facts found in Sutton, we come to the same conclusions, and accordingly, sustain respondent's determinations as to the deficiencies in petitioner's income taxes. Additions to Tax -- Negligence
In the notice of deficiency, respondent determined that petitioner was liable for the addition to tax for negligence. Section 6653(a) provides for an addition to tax equal to 5 percent of any portion of an underpayment of tax if such is due to negligence or the intentional disregard of rules or regulations. Negligence is defined as the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Respondent's determination as to negligence is prima facie correct and the burden is upon the taxpayer to prove the addition erroneous. Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). In deciding to invest in Tristar, petitioner relied solely upon the representations of Kelley, a person who gained financially when petitioner participated in the *570 transactions giving rise to the erroneous deductions and credits. Such reliance is unreasonable and contrary to what a reasonably prudent investor would have done. LaVerne v. Commissioner, 94 T.C. 637, 652 (1990). A reasonably prudent investor would have, prior to his purchase of his limited partnership interest in Tristar, obtained an opinion from an independent person qualified to evaluate the commercial viability of the trailer. Because petitioner relied exclusively on the promoter's representations, we find that he was negligent and, therefore, liable for the addition to tax under section 6653(a) for 1977 and 1978. Increased Interest
Respondent determined that petitioner is liable for increased interest pursuant to section 6621(c). Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (an underpayment of more than $ 1,000) attributable to a "tax-motivated transaction." The increased rate applies to interest accrued after December 31, 1984. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Certain transactions are *571 deemed to be "tax motivated" by section 6621(c)(3). In addition, the regulations specify additional transactions that are deemed tax motivated, including transactions whose deductions were disallowed under section 183 because the activity was not engaged in for profit. Sec. 6621(c)(3)(B); sec. 301.6621-2T, Q-4 & A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984); Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). In disallowing petitioner's partnership losses and credits, we concluded that the partnership's Nitrol Program activity was not engaged in for profit. Accordingly, we hold that petitioner is liable for the increased interest provided for by section 6621(c). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. FoodSource, Inc., was a California corporation formed in late 1979 by Dixon to manufacture, sell and operate Nitrol containers which were to be used to ship perishable commodities by ship and by train. See Noonan v. Commissioner, T.C. Memo 1986-449↩.
3. Secs. 38(a)(2) and 46(a) allow an investment tax credit based on a percentage of the cost of a "qualified investment." Under sec. 46(c), a "qualified investment" can only be in "sec. 38 property." Sec. 48(a) limits "sec. 38↩ property" to certain tangible property. Therefore, the investment tax credit is available only on tangible property. 4. The availability of accumulated cost recovery system depreciation under sec. 168 is also linked to tangible property. Sec. 0168 provides for depreciation on "recovery" property. Sec. 168(c) defines "recovery" property as "tangible property." Thus, the depreciation deduction under sec. 168↩ is available only on the cost of tangible property.